## STATE v. JACOBS.

In a prosecution for murder, where the evidence showed that the fatal shot was fired either by the deceased herself or by the defendant at close range, evidence of experiments and expert testimony on behalf of the state to show that the distance of the revolver was between light contact and one-fourth inch from the clothing was immaterial.

The erroneous admission on behalf of the state of immaterial evidence of experiments and expert testimony to show the distance

of the revolver from breast of deceased was prejudicial to accused.

In a prosecution for murder, the refusal of an instruction that it is no part of the jury's duty to determine how the fatal shot was fired, unless they find beyond a reasonable doubt that it was fired by the defendant, since it is not the duty of the defendant to explain how the shot was fired, and the giving of an instruction that, if the jury are able reasonably to account for the death of deceased on some other theory than that of the guilt of the defendant, the jury should find the defendant not guilty, was erroneous as requiring the jury to account for the death of deceased on some other theory than that of defendant's guilt in order to acquit.

(Opinion filed, October 4, 1910.)

CORSON, J., dissenting.

Appeal from Circuit Court, Meade County. Hon. JOSEPH W. JONES, Judge.

Oscar Jacobs was convicted of murder, and appeals. Reversed, and new trial ordered.

*Harry P. Atwater* and *Sears & Potter,* for appellant. *S. W. Clark, Atty. Gen., C. D. Sterling, Asst. Atty. Gen.,* and *John T. Milck,* for the State.

HANEY, J. The defendant in this action, having been convicted of murder and sentenced to imprisonment for life, removed the record of such conviction to this court for review by an appeal from the judgment of the circuit court and its order refusing a new trial.

On Monday, January 18, 1909, at Sturgis, in Meade county, Elba Roberts, a young woman with whom the accused had been acquainted for three or four years, died instantaneously from the effects of a gunshot wound "located to the left of the meridian line of the body about one inch"; a revolver bullet having entered between the third and fourth ribs, "pierced the pericardium and upper part of the right ventricle, the base of the pulmonary artery," and imbedded itself in the tissue in front of the vertebra, about an inch above and one inch to the right of the point of entrance. In the opinion of the physician who performed the autopsy "the distance traveled by the bullet was between four and five inches, and in traveling that distance it went up one inch and **inward one inch."**

Mrs. Bertha White, sworn on behalf of the state, testified as follows: "I am the wife of John White. Miss Elba Roberts lived with me some time in the month of January last. Am acquainted with the defendant. He visited Elba Roberts while she was at my place. I could not state the exact days. I know he saw her Saturday evening and Monday morning. He was over there some time before that—I cannot tell the exact number—maybe four or five times. He went out with her in the evening. On Monday, the 18th day of January, he came into my store, I should say, 9 o'clock in the morning, and I think he visited her between 3 and half past 3 again that day. Miss Roberts was washing clothes. My husband, John White, and myself were in the back room of the store, just about over here near the point marked sewing machine on the map. My husband was lying on the couch. Miss Roberts was sitting in the rocking chair just about here. While we were sitting there Miss Roberts came in and sat down in that rocking chair and began to sing. She came in from the kitchen from having washed the dishes. My husband asked me to hand him the guitar, and he began to chord, and she sang several songs, and she continued to sing until Mr. Jacobs came into the store. Then she got up and went into the store and closed the door. This was about a quarter past 8 in the evening. She staid in there with the door closed. . My husband and I remained where we were, talking for some time, and after three-quarters of an hour, or an hour probably, I heard a scream and a shot, and could not say hardly which first. I got up to go into the store, following my husband. I saw Miss Roberts lying on the floor. I came in through this door and just went diagonally and saw Miss Roberts lying right here this side of the store. The defendant was standing right by her feet. He was standing up. Probably he was bent over just a little bit. I said, 'We must telephone for a doctor.' He said after a little while—he asked: 'Where is that gun? I might as well kill myself.' I said, 'Stay where you are.' He made another statement similar to that, and I asked him to unlace her shoes. Just after that Mr. Dobbins came in. These squares marked boxes on the plat were empty

millinery boxes about four feet high and about square. The opening was towards this counter. It was closed on top and open on one side to take the other small boxes out of them."

On cross-examination witness continued: "I think the defendant had visited Miss Roberts about four times, including this night in question. I would not say for sure. I never heard any quarreling at any time that I know of. I did not hear any on this night in question. I was sitting about as far from the place where I found Miss Roberts lying, as that distance from here over the wall. There was a board partition between the room where I and my husband were and where Elba and the defendant were. It is papered on both sides, a fairly good partition, but not plastered. I do not know whether I could have heard them if they had been quarreling in the other room. I heard no indications of a quarrel on this night. The defendant was hollering for help when I came into this room. He said, 'Some one come in here!' or something to that effect. I asked him to take off Miss Roberts' shoes, and he did so. I do not remember that he made any exclamation from which I could get an idea of what his feelings were. Do not remember that he said, 'Poor kid,' or 'Poor girl.' Do not think I heard him say anything. When I came in he stood there. I went to the telephone first thing and telephoned for the doctor. I could not say that I paid any special attention to how he did act. I told you that he asked for the gun and said he might as well shoot himself. He said something to that effect (I could not say the exact words); that they might kill him for this (I could not say positively the exact words). He mumbled something afterwards to the effect, 'They might kill me for this.' When he said, 'I might as well kill myself,' I told him, 'I thought things were bad enough as they were.' He took off her shoes—made no effort to run away. Made no show or demonstration of any kind. I noticed a box of candy in the room where they were. The cover was off. It was not quite full. It was standing on the stove in the room where the hats were and one side of the counter from where the body was lying. The box of candy was, with reference to the place marked 'revolver,' on the floor—I cannot tell you how far it would be. From the door or entrance of the room, this box

of candy was 24 or 25 feet. There were some chairs near this stove, a couple of chairs near where this box of candy was. I testified before the coroner's inquest. If I testified before the coroner's inquest that Oscar said, 'I don't know why she killed herself,' I presume that might have slipped my mind. If I did say so then, I probably had it in my mind then. I will not say positively that I did not so state. I do not remember of testifying to that. I do not remember whether he made such a statement. I heard a scream and the report of a gun, and I could not say which first. That is the testimony that I gave at that time. The defendant said, 'Somebody come in here!' in a medium tone of voice, loud enough so that we could hear him. I heard him make the request before I came into the room. It was immediately after the report of the revolver. It was very soon after that, and I and my husband did go in. This written statement now read to me of my testimony before the coroner's jury, 'I wanted to know what is the matter;' he says, 'Elba has killed herself;' and he says, 'I don't know why she killed herself,' I think is correct."

John F. White, the former witness' husband, testified to substantially the same facts.

At the time of Miss Roberts' death the accused was 24 years of age. He had resided with his parents on a farm in this state from 1892 to 1905, when he made settlement on a government homestead in North Dakota, where he resided until the latter part of December, 1908, when he went to Sturgis. He possessed a common school education. "His general reputation for peace and quietude" in the neighborhoods where he had resided was good. As a witness on his own behalf he testified fully as to his relations with the deceased and as to what occurred from the time he called upon her Monday evening until he was taken into custody. Having stated that he met her as she returned from closing the window blinds, his account of the fatal affair was as follows: "She put her hands up and tapped me on the side of the face, and says, 'I am going to fleece your pockets.' She had done that before. She put her hands in my outside pocket first and then started to put her hand in my inside pocket—her right hand. I

said, 'No, not in there.' She says, 'Yes, let me look in there.' I did not resist, and she put her hand in my pocket—her right hand—and pulled the gun out like that. She went through my outside pockets first and then held my coat with her left hand and was going into this pocket with her right hand. I said, 'No, not in there.' And she says, 'Yes.' She hung onto my coat with her left hand, taking out the gun with her right hand. It was quite dark there. I did not notice particularly. Soon the gun was discharged. I heard the report. I do not know how it happened. She fell towards me. I grabbed her in my arms and hollered for help right instantly after the discharge was made. I yelled: 'Oh! Good God! Come in here quick!' I repeated that a couple of times. At the same time I carried her around to the light to see how badly she was hurt. It was not light there for the reason that there was a counter about five feet high kept the light from shining over her. I carried her around the big show-case and laid her down there. I cannot tell exactly how she held the revolver, its being dark at the time. That was my usual way of carrying the revolver in my pocket. She had taken it out of my pocket once before. Mr. Boggess gave me this revolver in North Dakota. I had it, I think, about three months before I came to Sturgis. I sometimes took it out in the field where I was working to shoot gophers and things running around the prairie where I was working. When I left Steele to come here with the intention of not going back, I brought everything in my possession that amounted to anything with me. And in doing that I put the gun in my pocket. I had never carried a revolver before and was not in the habit of carrying a revolver. Would not have carried this revolver at this time but for the fact I did not expect to go back to Steele. I had laid Miss Roberts down before any one came into the room."

Numerous letters constituting the correspondence between the deceased and the accused were received in evidence, which tended to show the existence of a warm feeling of friendship between the writers, but which did not show the existence of a contract of marriage or in any way refer to a promise of marriage or an expected marriage between the parties. One witness on behalf of

the state testified to a conversation with the accused on January 12, 1909, when he was returning to Sturgis after a visit with Miss Roberts' parents, wherein he said: "He wanted to come to town to see the kid (meaning the deceased); that they were engaged; that their first engagement had expired and the second was drawing nigh"; that "he wanted to see the kid"; and "that if she did not marry him she should not marry anybody else." Another witness on behalf of the state testified to statements made by the accused to the effect that he was going with a girl at the millinery store; that they had "a fuss"; that he did not think they were engaged; that he did not care much about her; that he had thought he loved her but did not think so then; that he liked her parents real well and did not want to break it up himself; that he would rather let her do the breaking of the engagement; that he mentioned the name of a party who he said was trying to cut him out; and that he was not going away until he had convinced such party that he was not cutting him out. The deceased was "right handed," and there was evidence tending to prove the presence of powder stains or burns on her right hand and body. Evidently her death was either accidental, self-inflicted, or the willful act of the accused. Whether any motive for the alleged crime was shown; whether the evidence justified the conclusion that the killing, if done by the accused, was "perpetrated with a premeditated design to effect death"; or whether the entire evidence was sufficient to sustain the verdict—will not be considered. It is enough to observe that the case was one demanding the utmost care in the introduction of evidence and the instruction of the jury.

Dr. Albert H. Hamilton, of Auburn, N. Y., who claimed to be an "expert at autopsies and in cases of gunshot wounds," testified on behalf of the state that he had a method by which he could determine the distance from which the fatal bullet was fired; such method consisting in the making of targets of cloth similar to the clothing alleged to have been worn by the deceased, through which cartridges found in the possession of the accused were discharged from the revolver with which deceased was killed. Each experiment having been described in detail, 14 of these targets were offered in evidence, to each of which the defendant objected "as

incompetent, immaterial, and irrelevant, and for the reason that the circumstances under which this shot was fired, and the material into which it was fired, differ from the circumstances under which the shot was fired that killed Elba Roberts." The objection was overruled and each was received in evidence. Thereupon the witness was asked this question: "Take these different exhibits and state what you found under the microscope on these different ones in comparison with what was found on the clothing of the deceased." To which question the defendant objected "as incompetent, not a proper subject for expert testimony, and for the reason the jury have no means of examining under a microscope, and for the further reason that the results are as susceptible of being ascertained by the jury as by the witness." The objection was overruled, and the witness proceeded at length to describe the effect of each shot upon the target as compared with the effect of the fatal shot upon the deceased's clothing. Thereafter this question was propounded by counsel for the state: " 'Assuming that a young lady is found dead, and upon examining her clothing you found the conditions which you have enumerated as found by your experiments with these different targets, and assuming that her death was the result of a revolver shot from the exhibit introduced in evidence, an Iver-Johnson 32, five-inch barrel, automatic trigger working revolver, and assuming the bullet entered her left breast and going through the right ventricle, pulmonary arteries, and lodging in front of a direct line of the spinal column, and the autopsy physicians declaring, upon their examination, that the bullet had not deflected in any manner, but went straight to the place of lodgment, and assuming that the bullet found was a 32-caliber Smith & Wesson cartridge, and taking into consideration an account of different tests you have performed, are you able to state the distance the muzzle of the revolver was held from the girl when the shot was fired, and taking into consideration the clothing?' The witness answered: 'I am able to so state.' The counsel for the state then put the following question: 'Please state.' To which question defendant interposed the following objection: 'First, it is not a proper subject for expert testimony; second, that all of the conditions which are involved in this case

are not contained within the hypothetical question; third, that it is purely a guess; that it is the matter for the jury to determine; that it is invading the province of the jury; that it is a conclusion which the jury can draw from all the evidence as well as the witness; and that it is therefore incompetent and improper.' Which objection was overruled by the court, and the witness gave the following answer: 'The distance the revolver was held from the breast was between light contact and one-fourth inch from the clothing.'" In making these experiments the revolver was held at distances from the target, varying from slight contact to eight inches; in some the clothing composing the target or portions of it was "breathed through where the bullet hole would be," and in some the target was "placed over a piece of meat." The conditions were not the same in any two of them. Two-thirds of the evidence relied upon by the state to secure a conviction came from this expert, consisting of his opinions, his experiments, and his examinations.

As the object of all evidence is the ascertainment of the truth with reference to the existence or nonexistence of the facts in controversy, the criterion for the admissibility of evidence of experiments has always been sought in answer to the question: Will such evidence tend to enlighten the jury and enable them more intelligently to consider the issues presented? 12 Am. & Eng. Ency. Law, 399. When such evidence, if admitted, would neither tend to establish nor disprove any material issue, it should be excluded. Libby v. Scherman, 146 Ill. 540, 34 N. E. 801, 37 Am. St. Rep. 191; Ulrich v. People, 39 Mich. 245; State v. Lindoen, 87 Iowa, 702, 54 N. W. 1075. The evidence under discussion did not tend in the slightest degree to establish any material fact; it did not contradict any statement made by the accused out of court, nor any testimony offered by the defense. If entitled to any weight whatever, it merely tended to prove that the revolver, when discharged, was held between slight contact and one-fourth of an inch from the clothing of the deceased—a fact entirely consistent with the theory of accident, entirely consistent with the theory of the defense. It did not tend in the slightest degree to

prove that the fatal shot was fired by the accused, either intentionally or accidentally. Had evidence of experiments, tending to show that the revolver was held so far from the body of the deceased as to render the story of the accused impossible or even improbable, been introduced, an entirely different question would be involved. Here the state's evidence as to powder marks on the hand and body of the deceased, the statements of the accused out of court, and his statements on the witness stand, all tended to show that the revolver was near the deceased when it was discharged. Hence all of this experimental evidence was wholly immaterial. It could not have tended to enlighten the jury or enable them more intelligently to consider whether the shot was fired by the accused or by the deceased. The state was attempting to prove that the fatal shot was fired by the accused with intent to kill. None of Dr. Hamilton's evidence tended to establish that fact. All of it was immaterial and should have been excluded. Undoubtedly, there are numerous cases in which the introduction of immaterial evidence does not constitute reversible error because it affirmatively appears that its admission could not have been prejudicial. This, however, is not such a case. The evidence of these experiments, offered as it was by the state for the apparent purpose of proving defendant's guilt, and coming as it did from an expensive expert of national reputation, could have had no other effect upon the mind of an ordinary juror than to produce an impression unfavorable to the accused, notwithstanding the ultimate conclusion of the witness was entirely consistent with the theory of innocence. This is so, because "there is a natural tendency to infer from the mere production of any material object, and without further evidence, the truth of all that is predicated of it." 2 Wigmore on Evidence, 1157. If, in contemplation of these elaborate experiments, the immateriality of the expert's conclusion as to the distance of the revolver was not observed by the learned counsel for the state or the learned circuit judge, it hardly would be reasonable to assume that it was observed by the jury. The admission of this evidence, under the circumstances, was reversible error.

This requested instruction was refused: "(9) The jury are instructed that it is no part of their duty to determine how the shot was fired that killed Elba Roberts, unless you find beyond reasonable doubt from the evidence that it was fired by the defendant. That is, unless you find beyond a reasonable doubt from the evidence that the defendant fired the deadly shot, then it is not your province to go further and determine how the shot was fired, because it is not the duty of the defendant to explain how the shot was fired." And this given by the court on its own motion: "If in this case, assuming all the facts to be proven which the evidence tends to prove, yet if the jury are able reasonably to account for the death of Elba Roberts upon some other theory than that of the guilt of the defendant—that is, if the jury are able to account for the death of the said Elba Roberts as having occurred through some other agency than that of the defendant— then the jury should find the defendant not guilty." The requested instruction should not have been refused. And the one given was erroneous. The latter clearly conveyed the impression that it was the duty of the jury to convict unless they were able reasonably to account for the death of the deceased upon some theory other than that of defendant's guilt. In other words, if they were in doubt as to whether she intentionally or accidentally killed herself, they should convict. An erroneous process of reasoning was thus suggested. The accused was not required to satisfy the jury that the deceased killed herself, either accidentally or intentionally. It was for the state to prove to the satisfaction of the jury beyond reasonable doubt that her death was caused by the intentional act of the accused. In the peculiar circumstances of this case, the distinction between the instruction requested by the defendant and the one given by the court is of the utmost importance—one that should be observed if the cause be again tried.

Improper conduct on the part of the state's attorney in his argument to the jury is assigned as error. As the cause must be reversed, the assignment need not be considered. It should be

observed, however, that prosecuting officers too often allow their zeal to lead them beyond the limits of legitimate argument; that usually such conduct either creates prejudice in favor of the accused or results in a record of conviction subject to reversal; and that it is the duty of this court to insist upon fair and honorable methods in the prosecution of criminal actions.

Other assignments of error not likely to arise upon a retrial of the cause will not be considered. ·

The judgment of the circuit court is reversed, and a new trial ordered.

CORSON, J., dissents.