STATE, Respondent, v. FERGUSON, Appellant.

(204 N. W. 652.)

(File No. 5635. Opinion filed June 30, 1925.)

1. Judges—Criminal Law—County Courts—Preliminary Examination
   —Statute, Authorizing Change of Judge, Held Inapplicable to
   Preliminary Examination Before County Judge.

   Rev. Code 1919, Sec. 4455, authorizing change of judge in
   criminal action prosecuted by information in county court, ap-
   plies only to actual trial of criminal cases in such court, and
   not to preliminary examinations before county judge, as com-
   mitting magistrate, in view of Sec. 4700, defining "informa-
   tion."

2. Judges—Criminal Law—Constitutional Law—County Judge, Sit-
   ting as Committing Magistrate, Not "Court," Within Consti-
   tutional Requirement of Uniformity in Proceedings.

   County Judge, conducting preliminary examination in crimi-
   nal case as committing magistrate, is not a "court," within
   Const., Art. 5, Sec. 34, requiring uniformity in proceedings of
   all courts of same class or grade, so as to entitle accused to
   change of magistrate on filing affidavit of prejudice, under
   Rev. Code 1919, Sec. 4422, or Sec. 4455.

3. **Constitutional Law—Venue—Statute, Authorizing County Judge to Act as Committing Magistrate, Not Unconstitutional in Not Authorizing Change of Magistrate on Affidavit of Prejudice.**

Statute, authorizing county judges to act as committing magistrates, construed as not authorizing change of magistrate on affidavit of prejudice by defendant, as in case of justice of peace, under Rev. Code 1919, Sec. 4422, is not repugnant to Const. U. S., Amend. 14, Sec. 1, as denying equal protection of laws; same procedure being provided for all persons in like situation.

4. **Criminal Law — Venue — Preliminary Examination by County Judge, as Committing Magistrate, After Denying Application for Change of Judge, Sufficient to Support Information.**

As right to preliminary examination exists only by virtue of statute, and provision of Rev. Code 1919, Sec. 4422, for change of magistrate applies only to justice of peace, examination by county judge, as committing magistrate, after denying application for change of judge, was not invalid, under Sec. 4707.

5. **Homicide—Evidence—Trial—Appeal and Error—Evidence Held So Lacking in Probative Force as to Require Reversal for Errors Depriving Defendant of Fair and Impartial Trial, Without Considering Sufficiency of Evidence to Sustain Conviction.**

In prosecution for uxoricide, evidence, which was largely circumstantial, held so far from presenting high degree of probative force desirable to sustain conviction as to require reversal for errors depriving defendant of fair and impartial trial, without considering sufficiency of evidence to sustain conviction.

6. **Homicide—Circumstantial Evidence—Absence of Common Inducements to Crime Considered, in Analyzing Evidence, Almost Entirely Circumstantial.**

Motive is not indispensable element in proof of murder, but evidence thereof is admissible, and, when almost entirely circumstantial, entire lack of common inducements to crime should be considered in analyzing evidence.

7. **Criminal Law—Trial—Judge's Remark that Circumstantial Evidence Might Be Stronger than Direct Evidence, as in Case of Incident Related by Him, Held Reversible Error.**

Court's remark during examination of juror, while at least two members of trial jury were in box, that circumstantial evidence might be stronger and more convincing than direct evidence, as in case of incident related by him, held reversible error, as argument and expression of opinion.

8.  Criminal Law—Trial—Judge Cannot Express Opinion on Facts, Credibility of Witnesses, and Weight of Testimony.

Under Rev. Code 1919, Sec. 4903, trial judge cannot express to jury his opinion on facts, credibility of witnesses, and weight of testimony, but can only charge them on matters of law; weight of evidence admitted or its relative weight as compared to other items or classes of evidence being exclusively for jury.

9.  Criminal Law—Circumstantial Evidence—Circumstances Must Be Sufficient to Exclude Every Other Hypothesis Except Guilt to Warrant Conviction on Circumstantial Evidence.

To warrant conviction on circumstantial evidence, circumstances proved must be sufficient to exclude to moral certainty every other hypothesis except guilt.

10.  Criminal Law — Evidence — No Distinction Between Relative Weight of Circumstantial and Direct Evidence.

There is no distinction as matter of law between relative weight of circumstantial and direct evidence.

11.  Constitutional Law—Witnesses—Trial—Supreme Court Not Concerned with Wisdom of Statute Prohibiting Expression of Opinion on Credibility of Witnesses and Weight of Testimony by Trial Judge.

Supreme Court is not concerned with wisdom of Rev. Code 1919, Sec. 4903, prohibiting trial judge from expressing to jury his opinion on facts, credibility of witnesses, and weight of testimony.

12.  Criminal Law—Instructions—Expression of Trial Judge's Opinion on Facts During Examination of Jurors as Improper as in Course of Instructions.

It is as improper, under Rev. Code 1919, Sec. 4903, for trial judge to communicate his opinion to jurors on facts, credibility of witnesses, and weight of testimony during the examination of prospective juror, or elsewhere in course of trial, as in course of his instructions.

13.  Criminal Law—Instructions—Trial—Judge's Remarks that Circumstantial Might Be Stronger than Direct Evidence Held Not Cured by General Instructions Several Days Later.

Judge's remarks, during selection of jury, that circumstantial evidence might be stronger and more convincing than direct evidence, as in case of incident related by him, held not cured by general instructions 4 or 5 days later, without specific reference to such remarks, that jury were sole and exclusive judges of all questions of fact, weight of testimony, and credibility, of witnesses.

**14.** **Criminal Law—Jury—Trial—Allowing Jury to Enjoy Private Grounds of Private Counsel Assisting State's Attorney, on Warm Evening, Held Misconduct Requiring Reversal.**

Taking jury in charge of bailiffs, after submission of all testimony and before argument began, to spacious and comfortable private grounds about residence of private counsel retained to assist state's attorney, where they diverted themselves for over an hour during extremely warm evening under such circumstances that they and such counsel must have known they were accepting his hospitality, held misconduct requiring reversal.

**15.** **Criminal Law—New Trial—That Jurors Were Entertained or Treated by Successful Party or His Attorneys Generally Ground for New Trial.**

That members of jury were entertained or treated by successful party or his attorneys is generally ground for new trial, without showing intentional impropriety, or that any jurors were actually influenced thereby.

**16.** **Criminal Law—Cross-examination of Defendant, in Uxoricide Prosecution, as to Treatment of Deceased's Son by Former Marriage and Defendant's Former Wife, Held Prejudicial Error.**

In prosecution for uxoricide, cross-examination of defendant as to whether he attempted to force deceased's sick son by former marriage from house, whether his first wife was dead when he married deceased, whether he had been living with such wife, when he left her, and whether he beat her up and had to leave state, where they lived, in a hurry, held prejudicial error.

**17.** **Criminal Law—Evidence—Cross-examination of Defendant as to Quarrel with Deceased Several Nights Before Latter's Death Held Prejudicial Error.**

In uxoricide prosecution, cross-examination of defendant as to whether he and deceased were quarreling 2 or 3 nights before latter's death and stopped when they heard her brother, who was living with them, come to door, held prejudicial error, in absence of testimony as to quarrels with deceased, or claim of inadvertent omission thereof, on state's case in chief or claim of after-acquired information, though defendant answered in negative.

**18.** **Criminal Law—Cross-examination—Prosecutor's Duty to Offer Testimony in Support of Insinuations in Questions Answered Negatively by Defendant on Cross-examination.**

Good faith and diligence required that private prosecutor, cross-examining defendant as to quarrel with wife, for whose murder he was being tried, and his ill treatment of his stepson

and former wife, pursue matter after defendant's denial of insinuations and offer testimony in support thereof.

19.  **Criminal Law—State's Attorney—State's Attorney and Court Should Not Permit Privately Employed Special Prosecutor to Conduct Trial Unfairly.**

Law contemplates that trial of criminal case be conducted on state's behalf by public officer, the state's attorney, and fairly for best interests of public and defendant's rights, and neither state's attorney nor court should permit privately employed special prosecutor to turn prosecution into persecution.

20.  **Criminal Law—Appeal and Error—Matters Not Likely to Arise on New Trial Not Considered.**

Matters not likely to arise on new trial need not be considered.

21.  **Criminal Law—Appeal and Error—Conviction Reversed for Errors Depriving Defendant of Right to Fair and Impartial Trial.**

While mere technical error should not work reversal unless substantial rights of defendant were clearly prejudiced (Rev. Code 1919, Sec. 5044), conviction should be reversed and new trial granted, where defendant did not receive fair and impartial trial becouse of errors, though some might be held without prejudice, standing alone or under different circumstances.

Appeal from Circuit Court, Hand County; HON. JAMES Mc-NENNY, Judge.

Arthur J. Ferguson was convicted of first degree manslaughter, and he appeals. Reversed and remanded.

*Frank R. Fisher,* of Miller, and *Gardner & Churchill,* of Huron, for Appellant.

*Buell F. Jones,* Attorney General, and *C. M. Carroll,* State's Attorney, of Miller (*Bernard A. Brown,* of Pierre, on the brief), for Respondent.

(1)  To point one of the opinion, Appellant cited: City of Sioux Falls v. Neeb, 20 S. D. 244, 105 N. W. 735; State v. Weltner, 7 N. D. 522, 75 N. W. 779; State v. Sorenson, 84 Wis. 27, 53 N. W. 1124.

Respondent cited: State v. Rozum, 80 N. W. 479.

(2)  To point two, Appellant cited: McLain v. Williams, 11 S. D. 60, 75 N. W. 391.

(3)  To point three, Appellant cited: In re Beddard (Mo.), 17 S. W. 693; Mannie v. Hatfield, 22 S. D. 475, 118 N. W. 817.

(8)   To point eight, Appellant cited:   State v. Hazlett (N. D.), 105 N. W. 617; State v. Philpot (Ia.), 66 N. W. 731; State v. Stuvell (Ia.), 15 N. W. 417; State v. Redwine (Tex.), 213 S. W. 636.

(9)   To point nine, Appellant cited:   State v. Jacobs, 26 S. D. 193; State v. Korth, 39 S. D. 123.

Respondent cited:   State v. Colvin, 24 S. D. 567.

(14)   To point fourteen, Appellant cited:   State v. Flavin, 35 S. D. 530; McGilvery v. Lawrence, 35 S. D. 443; Godfrey v. Dalquist, 27 S. D. 373; Peterson v. Siglinger, 3 S. D. 255; Sherlock v. Dineen, 41 S. D. 533; Rainy v. State (Ga.), 27 S. E. 709; Walkery v. Hunger, 17 Ga. 354; Stafford v. Oskaloosa (Ia.), 11 N. W. 668; Insurance Co. v. Wright, 79 S. W. 49; Bank v. Hix (Tex.), 164 S. W. 1035; In re Quinn (Mich.), 147 N. W. 566; People v. North (Mich.), 117 N. W. 62; Sandstrom v. Ry. Co. (Ore.), 136 Pac. 878.

(16)   To point sixteen, Appellant cited:   State v. Lamont, 23 S. D. 174; Richardson v. Gage, 28 S. D. 390; State v. Goodnow, 41 S. D. 391; State v. Kaufman, 46 S. D. 585; Hansen v. Boots, 41 S. D. 96.

Respondent cited:   State v. Phelps, 5 S. D. 480; State v. Vroman, 45 S. D. 465; Real v. People, 42 N. W. 270; Wilbur v. Flood, 16 Mich. 40; Foster v. People, 18 Mich. 265; State v. McCartney, 17 Minn. 76.

(17)   To point seventeen, Respondent cited:   People v. Kinsman, 192 N. Y. 421, 85 N. E. 676; People v. Cosnides, 117 N. Y. 718, 92 N. E. 1095; State v. Robinson, 86 Mich. 415, 49 N. W. 260; Jones v. State (Ala.), 57 So. 36; People v. Hite, 8 Utah 461, 33 Pac. 254.

CAMPBELL, J.   Defendant, a man 68 years of age, was informed against for the murder of his wife, Sarah J. Ferguson, a woman of approximately 70.   He was convicted of manslaughter in the first degree and given the maximum sentence of 20 years in the penitentiary, together with a fine of $1,000.   From the judgment and an order denying his application for a new trial, he appeals.

Appellant assigns error in support of six principal contentions:   First, that he had no legal preliminary examination before

his trial; second, that the evidence is insufficient to justify the verdict; third, that the trial judge in several instances abused his discretion to the prejudice of defendant; fourth that the jury was guilty of misconduct; fifth, that improper cross-examination of appellant was permitted over his objection; sixth, that the private prosecutor, who assisted the state's attorney, was guilty of misconduct. These several groups of assignments will have our attention in the order named.

Section 4707, Code 1919, so far as applicable here, provides:

"*No Information Until Preliminary Examination.*—No information shall be filed against any person for any offense until such person shall have had a preliminary examination thereof as provided by law before a magistrate, unless such person shall waive such right. * * * "

Appellant contends in this case that an information was filed and his trial had without his first having had a legal preliminary examination before a magistrate. In the first instance a preliminary information for murder was filed before a justice in Hand county, from whom appellant took a change of venue. The second justice, feeling himself disqualified by reason of having been a member of the coroner's jury, on his own motion called in Hon. C. C. Briggs, county judge of Hand county, to hold the preliminary examination, and the county judge, purporting to act as a committing magistrate for and in behalf of said justice, over the objection of the appellant, conducted the examination and bound the appellant over. Appellant thereupon instituted habeas corpus proceedings in the circuit court, by virtue of which the preliminary examination conducted as aforesaid was held irregular and void, the commitment set aside, and the defendant ordered discharged. Immediately thereafter a new preliminary information, upon the same charge, was filed before the said Briggs, county judge, and appellant was brought before him for preliminary examination. Before the examination commenced, appellant filed an affidavit alleging that he could not have a fair and impartial hearing and examination before the said Briggs by reason of bias and prejudice and demanded a change of committing magistrate. The county judge denied the application, held the preliminary examination, and bound the appellant over. It is appellant's contention

that he was entitled as a matter of absolute right to a change of committing magistrate upon the filing of his affidavit before County Judge Briggs; that, upon the filing of such affidavit, the county judge had no further jurisdiction except to enter the order transferring the matter to another magistrate; and that the purported examination was void. If the committing magistrate, before whom appellant was brought for examination upon the new or second preliminary information, warrant, and arrest, had been a justice of the peace, there is no doubt but that appellant's contention would be correct by virtue of the provisions of section 4422, Code 1919. This section of the statute, however, is limited by its terms to "criminal proceedings before a justice of the peace." It does not by any express terms apply to any other committing magistrate. The only provision for change of judge or place of trial in criminal proceedings in the county court is section 4455, Code 1919, which reads:

"*Change of Judge and Place of Trial.*—A criminal action prosecuted by information in the county court may, at any time before the trial is begun, on the application of the defendant, be removed from the county in which it is pending, whenever it shall appear to the satisfaction of the court, by affidavit or other evidence, that a fair and impartial trial cannot be had in such county; in which case the court may order the defendant to be tried in some near or adjoining county in the circuit court of any circuit where a fair and impartial trial can be had; but the defendant shall be entitled to the removal of the action but once, and no more; and if he shall make affidavit that he cannot have an impartial trial by reason of the bias or prejudice of the presiding judge of the county court where the action is pending, the judge of such court must call another county judge to preside at such trial and it shall be the duty of such other judge to preside at such trial and do any other act with reference thereto as though he were the presiding judge of such county court."

This section, it will be observed, applies only to "a criminal action prosecuted by information."

Section 4700, Code 1919, defines information as follows:

"The word 'information' as used in this title, unless a different intention clearly appears, shall be interpreted to mean a verified

statement in writing, charging one or more persons with the commission of a public offense requiring the intervention of a grand jury or a preliminary examination, filed by the state's attorney or other person duly authorized to perform the duties of state's attorney with respect thereto, in a court having jurisdiction to try and determine the offense specified therein."

This section is annotated by the Code Commission as follows:

"This is a new section designed to distinguish the charge filed in the trial court from the charge presented to the committing magistrate, which has been designated the 'preliminary information.' "

[1] It is very apparent, in view of the provisions of section 4700, that the plain and natural construction of section 4455 is that it applies only to the actual trial of criminal cases in the county court and does not apply to the case of a preliminary examination before the county judge as a committing magistrate. The appellant, in his brief, recognizes the normal interpretation of section 4455, Code 1919, but nevertheless contends that it is essential that this court should extend by construction either section 4455, Code 1919, or section 4422, Code 1919, to embrace the case of a preliminary examination upon preliminary information before a county judge, acting as a magistrate, and that otherwise his constitutional rights, both state and federal, are violated.

[2] So far as concerns the Constitution of this state, appellant's position, briefly stated, is that, inasmuch as an accused, brought before a justice of the peace as committing magistrate for examination upon a preliminary information, is entitled to a change of committing magistrate upon the filing of an affidavit of prejudice, then our statutes must be construed to accord him the same privilege if under like circumstances he is brought before a county judge as a committing magistrate, otherwise the statute authorizing county judges to act as committing magistrates must be held void under section 34, art. 5, of the Constitution of the state of South Dakota, which reads as follows:

"All laws relating to courts shall be general and of uniform operation throughout the state, *and the organization, jurisdiction, power, proceedings and practice of all the courts of the same class or grade so far as regulated by law,* and the force and effect

of the proceedings, judgments and decrees of such courts sever-
ally *shall be uniform*: Provided, however, that the Legislature may
classify the county courts according to the population of the re-
spective counties and fix the jurisdiction and salary of the judges
thereof accordingly."

Appellant contends that the county court and justice court,
when acting as committing magistrates, are courts of the same
class and grade, and the Constitution, therefore, requires uniform-
ity in their proceedings, including uniformity in the privilege of
change of venue.    It is sufficient answer to this contention to
point out that a committing magistrate, conducting a preliminary
examination in a criminal case, is not a "court" within the mean-
ing of this section of the Constitution.

"A prelminary hearing is in no sense a trial.   8 R. C. L. § 67;
Latimer v. State, 55 Neb. 609, 76 N. W. 207, 70 Am. St. Rep.
403.   Such county judge, when sitting as a magistrate, is not sit-
ting as a county court any more than would a justice of this court,
if sitting as a magistrate upon a preliminary hearing, be sitting
as the Supreme Court.   People v. Crespi, 115 Cal. 50, 46 P. 863."
State v. Sonnenschein, 37 S. D. 139, 156 N. W. 906.   See, also,
State v. Raaf, 16 Idaho 411, 101 P. 747; Ex parte Gist, 26 Ala.
156; State v. Nast, 209 Mo. 708, 108 S. W. 563; People v. Cohen,
118 Cal. 74, 50 P. 20; People v. Swain, 5 Cal. App. 421, 90 P.
720; State v. Fox, 83 Conn. 286, 76 A. 302, 19 Ann. Cas. 682.

[3]   Appellant further urges, however, that the statute grant-
ing power to county judges to act as committing magistrates, un-
less it be construed as authorizing change of venue upon affidavit
of prejudice by defendant, as from a justice of the peace, is
repugnant to section 1, art. 14, of the Constitution of the United
States.

Here appellant apparently contends that he is denied equal
protection of the laws if he cannot have a change of venue from
the county judge, as committing magistrate, in view of the fact
that a change of venue may be had from a justice as a committing
magistrate.   We believe this section of the federal Constitution is
satisfied so far as criminal procedure is concerned, so long as the
same procedure is provided for all persons in like situation. See
Ocampo v. U. S., 234 U. S. 91, 34 S. Ct. 712, 58 L. ed. 1231.

[4] To summarize on this point, we hold a committing magistrate as such is not a court, and does not exercise in any strict sense judicial power; that there is in this state no constitutional provision for a preliminary examination and that the right to the same exists only by virtue of statute; that any magistrate, as defined by our statute, may conduct a preliminary examination, and, if such magistrate is a justice of the peace, then by virtue of section 4422, Code 1919, the accused may have a change of venue by the filing of an affidavit of prejudice, but that said statutory provision for change of venue does not apply to the case of a preliminary examination before any committing magistrate other than a justice. And this condition of our statute law is not in violation of the provisions of either the state or federal Constitution. In the instant case, therefore, appellant was not entitled to a change of venue, and the fact that the county judge proceeded with the preliminary examination after denying appellant's application for a change of venue therein did not render the preliminary examination invalid and said examination was sufficient in every respect to support the subsequent filing of the information under section 4707, Code 1919.

[5, 6] The second group of errors assigned by appellant go to the matter of the sufficiency of the evidence to support the verdict. The view we take upon some of the other errors assigned renders it unnecessary for us to determine the question of the legal sufficiency of the evidence to support the verdict. It will not therefore be set out in detail. We have examined the testimony, however, with great care, and have painstakingly read the entire transcript and deem it proper to observe that the evidence adduced upon the part of the state is very far from presenting that high degree of probative force which is always to be desired as the foundation upon which to rest an abiding conviction of guilt, beyond all reasonable doubt, in the case of so serious an offense. The evidence is very largely circumstantial. It is the theory of the state that appellant struck, choked, strangled and suffocated his wife, whereof she died. It is the theory of appellant that the death came about by natural causes, probably heart failure. The post mortem examination was very superficial. It did not reveal the characteristic findings which usually, although

perhaps not invariably, follow death from a blow on the head, or from strangulation, or from suffocation.    It was not sufficiently exhaustive to preclude the possibility of death from natural causes. It did reveal an abnormal heart condition in the deceased consisting of a heart enlargement of approximately 50 per cent.    The medical testimony on the part of the state is not as satisfactory as could be wished.    One of the state's medical witnesses in particular, who was the first doctor to view the deceased, seems to have adopted the view of death from external violence at an early stage in the proceedings, and thereafter to have been more interested in vindicating his personal opinion than in aiding the jury by a full, fair, and impartial disclosure of facts in response to questions propounded.

There is a noticeable lack of showing as to any motive or incentive on the part of appellant.    True, motive is not an indispensable element in the proof of this offense, but evidence going to show motive would be perfectly admissible, and, when the evidence consists, as it does here, almost entirely of circumstances, we think that, in analyzing the evidence, one of the circumstances deserving of consideration is the entire lack of any of the common inducements to crime as generally accepted upon the basis of human experience.    The lack is particularly noticeable in the instant case, in view of the opening statement made by the state's attorney to the jury, wherein he said:

"We will expect to prove that, while here in Miller, and also down on the farm where they lived before they moved in here, there had been some continuous trouble along between them."

Added to that is the fact that the circumstances were such that trouble of any moment or long standing between appellant and deceased should have been easily shown.    Appellant and deceased had been married for 13 years, during the first 10 of which they resided on a farm in the southwest part of Hand county, and the last 3 of which they resided in the town of Miller.    The deceased was survived by 6 children, all grown, and 5 married, born of a prior marriage between deceased and one Collins.    Some of these children lived in the country near the place of residence of appellant and deceased while they were on the farm, and others lived in the town of Miller; one son living directly across the street

from the home of deceased and appellant. The evidence shows that visits to the home of the deceased were frequent upon the part of her children, and grandchildren; also her youngest son, Tom Collins, who testified as a witness in the case, lived with appellant and deceased for a year or more after they moved to the town of Miller, and a brother of deceased, William Scott, who also testified on the part of the state, lived with deceased and appellant continuously for a period of 3 years immediately preceding her death. Yet there is no evidence, whatever, of any trouble or difficulty of any kind or of any quarrels or disagreements between appellant and deceased, and no evidence that their relations were not entirely harmonious. Neither is there an evidence that appellant was a man of violent or irascible temper. Neither is there any evidence to establish any reasonable hope of pecuniary gain to appellant from the death of his wife. He was not a man, apparently, of any means, while his wife had a 480-acre farm, being the one upon which they lived prior to their removal to Miller; but the evidence shows that appellant conducted the farm after their marriage and that after their removal to Miller the farm was leased by him and he collected the rents and incomes and paid the expenses in his own name. Deceased had made no will in his favor and does not appear to have carried any insurance in his favor.

William Scott, brother of deceased, left in the late afternoon of December 24th to spend Christmas with another brother in the country, leaving appellant and deceased at home alone. About 1 o'clock on the morning of the 25th defendant appeared at the home of his wife's son, William Collins, directly across the street from his residence and said, "Will, your mother is dead." Will Collins and his wife went immediately to the residence of the deceased and found that she was in fact dead, and other members of the Collins family arrived very shortly, and there is some evidence, the credibility of which we do not now consider, that appellant appeared at that time to be slightly intoxicated. It also appears that, during the evening of December 24th, appellant went out and purchased a pint bottle of what is commonly called "moonshine," and that the bottle was found more than half full on the floor in the dining room where appellant and his wife were

accustomed to sit in the evening. Appellant's statement is that he did purchase the liquor down town, took one drink of it on the way home, and, after reaching home, his wife drank a little of it, and he had two more drinks during the interval before they retired. There is no evidence that appellant was or had been at any time intoxicated to such a degree as not to realize what he was about, or that he was given habitually to drinking, or did drink to any considerable extent, or that he was quarrelsome and violent when drinking, or at any time, and certainly it can hardly be inferred under the circumstances of this case that the liquor drunk by the defendant would inspire him with homocidal mania or in and of itself cause him, without any apparent reason or motive, to commit so outrageous an act as uxoricide.

Another thing that compels itself to our notice, in examining this record, is the relative situation of the appellant in the community. The deceased was born Sarah J. Scott, and appellant knew her and her brother, William, and others of the family in New York 60 years or more ago. Some of the Scott family appear to have moved to Iowa. Appellant, who was a carpenter by trade, was in Iowa for several years, about 1878, and renewed his acquaintance with the Scott family and visited at the home of deceased who was then married to and living with her first husband, Gilbert Collins. Thereafter deceased and her husband, Collins, moved to South Dakota and were among the pioneer settlers in Hand county, apparently acquiring a competence and raising a considerable family of children, 6 of whom are still living, some in the town of Miller, and some in the country adjacent, in addition to one or more brothers of deceased, also apparently old-time settlers in Hand county. Appellant, who was also previously married, seems to have lived most of the time in the state of New York. He came out to Iowa in the spring of 1909, and, after being there for some months, came to Miller, where he worked at his trade as a carpenter for several months and in June, 1910, was married to the deceased, whose first husband, Gilbert Collins, had previously died. They lived in the house of deceased in Miller until the spring of 1911, when they moved down to her farm, some 17 miles southwest of Miller, in a neighborhood where a number of her children lived, and continued there until the spring of 1919,

when they moved back to the residence in the town of Miller. The Scott and Collins families were apparently well known and long established in Miller and vicinity, much more so than appellant. The Collins children were naturally enough very active in connection with the prosecution of this case. Within a day after their mother's death, they had retained private counsel to assist the state's attorney who participated in all the preliminary proceedings as well as the trial, and, within a short time after the conviction of the appellant, they instituted an action to bar him from any right, title, or interest in the estate of the deceased. The state's attorney was assisted upon the trial of the case by two private prosecutors. Appellant was unable to furnish bail, and was confined in jail from his arrest in December until his trial in June. He was charged with a most atrocious crime claimed to have been perpetrated under circumstances which might well arouse indignation and feeling in any community. We believe a statement of this court in a former case is particularly applicable to the facts and circumstances attendant upon the case at bar:

"Whether any motive for the alleged crime was shown; whether the evidence justified the conclusion that the killing, if done by the accused, was 'perpetrated with a premeditated design to effect death'; or whether the entire evidence was sufficient to sustain the verdict—will not be considered. It is enough to observe that the case was one demanding the utmost care in the introduction of evidence and the instruction of the jury." State v. Jacobs, 26 S. D. 183, 128 N. W. 162.

[7] The third group of errors assigned by appellant have to do with the conduct of the trial judge and particularly with certain statements and remarks made by him at various times during the progress of the trial. In fairness to the trial judge we desire here to state that the matters dealt with under this group were set up on motion for new trial and on appeal, as is proper under section 2556, Code 1919, not by settled record, but by affidavit, and were not contained in the record settled and certified to by the trial judge pursuant to section 2546, Code 1919. The motion for new trial was presented and argued before a circuit judge other than the one who tried this case, so these matters were never actually presented to or reviewed by the trial judge, on motion for new trial or otherwise. One of the assignments under this group predicates

error upon what has been denominated in argument on appeal as "the bear story." It appears from the record that some 3 days were occupied in selecting a jury, and that in examining the jury the attorney for the state, in practically every instance, inquired of the prospective juror if he was familiar with what is known as circumstantial evidence and if he would bring in a verdict of guilty on circumstantial evidence, and several of the jurors expressed themselves as holding the opinion that circumstantial evidence would have to be very strong, standing alone, to persuade them to find defendant guilty of so serious an offense as homicide. After this had occurred a number of times, and when there were 12 prospective jurors in the box, of whom at least 2 became members of the trial jury, the trial judge interrupted the examination of a juror to tell an experience of his own occurring a number of years ago in the western part of the state wherein a man came into town and with much excitement told that he had been pursued in the hills by a bear. Thereupon a party was formed of whom the trial judge was one, which party went to the scene of the occurrence as it had been related to them, and, upon arriving there, they found the tracks of the man, but found no tracks of any bear. After relating this incident, the trial judge went on the say that circumstantial evidence might be stronger and more convincing than direct evidence, inasmuch as in the case of the incident related the man had told of actually seeing the bear, whereas, when the party came to the place where he said he had seen the bear, the absence of bear tracks made it plain to the party that no bear, in fact, had been there. To these remarks of the trial judge appellant's counsel promptly excepted. It is entirely apparent that the narration of this incident and the comment thereon by the trial judge in the presence of at least some of the jurors was nothing more nor less than an argument by the judge and an expression of opinion by the judge in favor of the greater reliability of circumstantial evidence, as compared with direct evidence, at least in some instances.

[8] It is perhaps desirable that the trial judge, while leaving the ultimate decision of questions of fact to the jury, should nevertheless be permitted to express to them his opinion upon the facts, the credibility of witnesses, and the weight of testimony, but such is not the law in this state. With us, by our statute, the

judge is limited in charging the jury to matters of law. Section 4903, Code 1919. And there is assuredly no rule of law with reference to the weight of circumstantial evidence or the relative weight of circumstantial evidence as compared to direct evidence. The law prescribes many rules as to admissibility of evidence, and sometimes prescribes more or less arbitrary rules as to the quantum of proof required upon a certain issue, but, any evidence being once admitted, it weight standing alone, or its relative weight as compared to other items of evidence or other classes of evidence, is exclusively for the jury.

"The attempts to prescribe arbitrary rules as to the weight of either of these forms of testimony have proved unsatisfactory; it is misleading to declare that either kind is, in a legal sense, inferior to the other. Both classes of testimony are indispensable in the administration of justice; and their relative value, depending upon the circumstances of each case, must be left to the jury." Jones on Evidence (3d Ed.), § 899.

"The rules of admissibility have nothing to say concerning the weight of evidence when once admitted." Wigmore on Evidence, § 26.

"The law declares nothing as to the relative probative force of direct and circumstantial evidence, and the court cannot argue to the jury the relative importance of evidence except as that is settled by some rule of law." People v. Howland, 13 Cal. App. 363, 109 P. 894.

[9] As to circumstantial evidence in a criminal case, there is but one rule of law, namely, a quantitative rule that the circumstances proved be sufficient to exclude to a moral certainty every other hypothesis excepting that of guilt. A sound statement of this rule is shown by the instruction of the court in the case of State v. Guffey, 39 S. D. 84, 163 N. W. 679, as follows:

"To warrant a conviction for crime on circumstantial evidence alone, the circumstances taken together should be of a conclusive nature, and leading on the whole to a satisfactory conclusion, and pointing to a moral certainty that the accused committed the offense charged; and it is invariably the rule of law that, to warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with each other, and consistent with the guilt of the party charged, and such

as cannot by any reasonable theory be true and the party charged
be innocent, and in this case, if all the facts and circumstances re-
lied upon by the state to secure a conviction can be reasonably
accounted for upon any theory consistent with the innocence of
the defendant, then the jury should acquit the defendant."

[10] It is to be observed that this is practically nothing more
nor less than an application of the reasonable doubt rule to cir-
cumstantial evidence. Many courts are quite accustomed to add
a statement which upon its face appears to be a rule of law as to
the relative weight of circumstantial and direct testimony; and
such an instruction has been approved by this court in State v.
Coleman, 17 S. D. 594, 98 N. W. 175, as follows:

"And I will say to you that the evidence which has been re-
ceived in this case is legal and competent, and if it is, in your
mind, of such a character as to exclude every reasonable theory
or hypothesis other than that of the defendant's guilt, beyond a
reasonable doubt, then and in that event it should be given the
same weight by you as would direct evidence of the fact alleged.
* * * Circumstantial evidence, when competent, and when com-
plete and satisfying to your minds, as has been charged, is entitled
to the same weight that direct evidence is."

The instruction last quoted, while it is sound enough perhaps
in its practical operation, is nevertheless misleading and inaccu-
rate in terminology in so far as it states as a matter of law that
circumstantial evidence is entitled to the same weight as direct
evidence. It purports to state an affirmative rule of law which is
nonexistent  What the instruction really means and all that it
should state is, in fact, negative; that there is no rule of law
establishing any distinction between the relative weight of circum-
stantial evidence and direct evidence. A much more accurate
statement of the principle involved is found in an earlier Dakota
case as follows:

"There is no ground for distinction between circumstantial
and direct evidence." Territory v. Egan, 3 Dak. 119, 13 N. W.
568.

In the instant case, therefore, the trial judge manifestly ex-
pressed to the jury his personal opinion and conviction upon a
matter, not of law, but of fact, upon a matter which under our

practice is peculiarly for the exclusive consideration of the jury, in the light of reason and experience, namely, the issue being whether a certain event, in fact, occurred, and there having been admitted in evidence proof of circumstances logically pointing to the occurrence of the event, just how great is the relative probative force or cogency or persuasiveness to the mind of that circumstantial evidence as compared with the direct testimony of an eyewitness that the event did occur.

In the instant case also the remark of the trial court was not only an invasion of the province of the jury, but it was entirely one-sided. It gave only the case in favor of circumstantial evidence. Perhaps no question has been more controverted in the books than this same question of the relative weight or persuasiveness of these two classes of evidence. In each of the two classes there are inherent defects and possibilities of error, not appearing in the other class, and also essential virtues not possessed by the other class.

"Direct or positive testimony might come from a very unreliable person, or, coming from a source of great respectability, might yet break down under the weight of its own absurdity. It is impossible, therefore, to fix any uniform value upon direct or positive testimony as such. It is equally impossible to fix a uniform value upon circumstantial evidence as such. In many cases the one justly outweighs the other, while in many others the preponderance is precisely reversed." Bowie v. Maddox, 29 Ga. 285, 74 Am. Dec. 61. See, also, Commonwealth v. Webster, 5 Cush. (Mass.) 295, 52 Am. Dec. 711; Haywood v. State, 90 Miss. 461, 43 So. 614; Moore on Facts, §§ 597-599; Wigmore, Principles of Judicial Proof, pp. 734-743.

In the ordinary case as in the case at bar, the circumstances upon which dependence is placed for conviction are themselves proved, each in their turn, by direct testimony, which direct testimony in proof of the circumstances is subject to all the vices and difficulties of direct testimony in proof of the ultimate issue. Whereas, the court in his illustration gave the strongest possible case for circumstantial evidence, namely, one where the circumstance (the absence of the bear tracks) did not depend upon any direct testimony or statements of witnesses, but was seen and observed directly by the triers of the fact, the hunting party.

[11, 12]   We realize that our discussion upon this point has proceeded very much as though the court in his charge to the jury had related this incident, and had expressed to the jury the opinion that circumstantial evidence was sometimes much stronger than any direct testimony.   This, of course, was not the case, but the story was told and the opinion expressed during the course of the trial and in the presence of at least a part of the jurors.   It is the contemplation of statutes such as ours that the jury shall receive from the judge nothing more than the law and that they shall not receive from him his opinions upon questions of fact, credibility of witnesses, persuasiveness of evidence, or any other matters not established by rule of law.   With the wisdom of such provision we are not here concerned.   It exists and its spirit and intent are plain.   And it is just as improper for a judge to avoid them by communicating his opinion to the jurors elsewhere in the course of the trial as it would be in the course of his instructions.

"As every practitioner knows, the jury are usually quick to seize upon and be guided by any opinion which they think the trial judge entertains as to the merits of the case or the weight of any particular evidence.   The statutes of this state prohibit the expression of any opinion on the facts by the trial judge.   Sections 8176, 8217, Rev. Codes 1899.   These provisions were discussed by this court in Territory v. O'Hare, 1 N. D. 30, 44 N. W. 1003, and again in State v. Barry, 11 N. D. 428, 92 N. W. 809.   In those cases the instructions of the court were held to be objectionable because they indicated the opinion of the trial judge as to the facts.   But it is apparent that the trial judge's opinion as to the merits of the case may be manifest by conduct or remarks in any other stage of the trial, as well as by the express language in the charge, and it is equally a violation of the spirit of the statutory prohibitions, whichever way the opinion is indicated." State v. Hazlett, 14 N. D. 490, 105 N. W. 617.

"The rule seems to be well settled that if the judge, during the progress of the trial, makes remarks in the presence of the jury, which would be erroneous and prejudicial had they been embodied in the formal charge given by him to the jury, it will entitle the losing party to have a verdict, to which they might have contributed set aside.   It is perfectly manifest that the remarks of the court, had they been formulated into a paragraph of

the instructions, would have been erroneous   We are constrained to hold that the remarks of the court were erroneous, and prejudicial to the defendant; and, although we are abundantly satisfied that they were unintentionally made, yet the rights of the defendant must be preserved and protected." State v. Philpot, 97 Iowa 365, 66 N. W. 730.

[13] As to whether the effect of such statement by the trial judge to the jury might be mitigated or cured by proper admonition, we express no opinion for the reason that so far as appears from the record in the instant case there was no attempt, either at the time of the remarks or later, specifically to admonish the jury to disregard them, and such remarks on the part of the trial court during the selection of the jury certainly cannot be deemed to be cured merely by a statement to the jury some 4 or 5 days later in the instructions, without any specific reference to the former remarks of the court, of the correct rule of law as it was stated generally in the instructions in this case, namely, that the jury were the sole and exclusive judges of all questions of fact, of the weight of the testimony, and the credibility of the witnesses.

. "On principle, it would seem that errors of this sort, when prejudicial, cannot be cured by the means attempted. In the first place such an instruction does not effect a cure. One of the purposes of the inhibition is to keep from the jury the opinion of the trial judge on questions of fact which the jury are to determine, and when the opinion of the judge is once made known to the jury, plainly no subsequent instruction can remove from the minds of the jurors the knowledge acquired thereby; at best, such instructions can only mitigate the offense." State v. Herwitz, 109 Wash. 153, 186 P. 290.

[14, 15] The fourth group of errors assigned by appellant go to the matter of misconduct of the jury. The trial occupied a number of days during the extremely warm weather in the month of June. The jury were kept together the entire time in charge of bailiffs and it appears that it was somewhat of a problem to provide for their comfort and entertainment, and particularly for relief from the heat, during the evenings. It further appears from the affidavits of the bailiffs in charge of the jury that on the evening of the 19th of June, after the testimony had all been

submitted, and before argument began, the jury, in charge of two bailiffs, were taken to the private grounds of the residence of one of the counsel retained to assist the state's attorney. These grounds were spacious and comfortable and included a fine lawn, shade trees, and a fountain, and the jurors sat there and visited and variously diverted themselves and enjoyed the comfort of the premises for something over an hour. It is to be noted that, as far as appears from the record, the jury were not at any time during the course of the trial taken to or entertained upon the private grounds or yard of any other residence in the city of Miller. It does not appear that the private prosecutor, or his family, were at home during this time, but it does appear that the private prosecutor himself was immediately across the street from his own premises, about 100 feet east, in the yard of another residence and in plain sight of the jury during practically all of the time that they remained upon his premises. These facts were not known to appellant or his counsel until after the close of the trial and were set up by affidavits.

It is significant that the private prosecutor, in two counter affidavits later filed by him, seeks to attack or explain practically everything else set up in the affidavits filed by appellant, but offers no denial or explanation, and, in fact, makes no mention whatever of the matter of the visit of the jury to his premises. There is no showing that he communicated in any way with the jury during this time, nor do we believe that there was any improper motive in the mind of the private prosecutor, the bailiffs, or the jurors, in bringing about this visit to his premises, but upon the record we cannot escape the conclusion that as a matter of fact the jurors did on the occasion in question, enjoy the hospitality of these private premises under such circumstances that both the jurors and the private prosecutor must have known that he was extending, and they were accepting and receiving, his hospitality to that extent. The private prosecutor having furnished to the jury the hospitality, comfort, and convenience of his private premises for their use under the circumstances of this case, we believe that the legal situation involved is identical with what it would have been had he, during the trial, furnished food, drink, cigars, or other articles of refreshment to the jury. In fact, there was, perhaps, a greater possibility in the instant case that the jury might feel under a

sense of obligation to the private prosecutor or might be influenced by the situation since here they were not receiving food, or drink, which they could procure for themselves if they desired, or which might be furnished to them, by practically any person, but they were enjoying the comfort and refreshment of the pleasant private grounds of the prosecutor, which hospitality was peculiarly individual to him, and which no one else could extend to them or permit them to enjoy. It is the weight of authority that it is generally ground for a new trial that members of the jury were entertained or treated by the successful party or his attorneys, without necessity of showing that there was intentional impropriety, or that any of the jurors were actually influenced thereby. To avoid all possibility of suspicion and preserve the confidence of parties and the public in the fairness and impartiality of jury trials, it is highly essential that extreme care should be exercised and that no conduct should be in any wise permitted whereby it may even be suspected that the minds of the jurors may be influenced either directly, or even unwittingly, by virtue of being placed under any sense of obligation to parties or attorneys for favors or hospitality extended. The importance of this matter has been several times recognized by this court. In Peterson v. Siglinger, 3 S. D. 255, 52 N. W. 1062, this court quoted with approval from the case of Knight v. Freeport, 13 Mass. 218, as follows:

"Too much care and precaution cannot be used to preserve the purity of jury trials. * * * We cannot be too strict in guarding trials by jury from improper influences. This strictness is necessary to give due confidence to parties in the results of their causes; and every one ought to know that for any, even the least, intermeddling with jurors, a verdict will always be set aside."

The same case was again quoted and approved in Godfrey v. Dalquist, 27 S. D. 373, 131 N. W. 299. In McGilvery v. Lawrence, 35 S. D. 443, 152 N. W. 698, this court again approves the case of Peterson v. Siglinger, and says in part:

"What the nature of the conversation between the juror and McKenzie and Rogers may have been is not material, and this juror and these parties may, in fact, have been entirely innocent of any wrong; but the circumstances are such as to justly cast suspicion upon the verdict of such a juror, and, if such a verdict

were to be sustained, it would cast just suspicion, in the minds of many, upon the purity of jury trials."

See, also, Sherlock v. Dinneen, 42 S. D. 533, 176 N. W. 519. The necessity of extreme care in these matters has been well expressed by the Alabama court in Craig v. Pierson Lumber Co., 169 Ala. 548, 53 So. 803, holding that a new trial should be granted when the successful party during the trial at the conclusion of the evidence and before argument took a juror to dinner at a hotel, although it does not appear that there was any improper motive therein, or that the case was in any way discussed, or that the juror was actually influenced thereby, and the court said in part:

"Aside from protecting the rights of parties, in the fair and impartial administration of justice, respect for the courts calls for their condemnation of any improper conduct, however slight, on the part of a juror, of a party, or of any other person, calculated to influence the jury in returning a verdict. So delicate are the balances in weighing justice that what might seem trivial under some circumstances would turn the scales to its perversion. Not only the evil, in such cases, but the appearances of evil, if possible, should be avoided."

See also, Thompson on Trials (2d Ed.), § 2564; Bradshaw v. Degenhart, 15 Mont. 267, 39 P. 90, 48 Am. St. Rep. 677; Garvin v. Harrell, 27 Okl. 373, 113 P. 186, 35 L. R. A. (N. S.) 862, Ann. Cas. 1912B, 744; People v. Montague, 71 Mich. 447, 39 N. W. 585; Sandstrom v. Oregon-Washington R. & N. Co., 69 Or. 194, 136 P. 878, 49 L. R. A. (N. S.) 889; Scott v. Tubbs, 43 Colo. 221, 95 P. 540, 19 L. R. A. (N. S.) 733; Rainy v. State, 100 Ga. 82, 27 S. E. 709. We are of the opinion that the facts show misconduct of the jury which was sufficient to constitute error, and under the circumstances of this case we are unable to say that such error was not prejudicial to the defendant.

[16] The fifth group of errors assigned by appellant are predicated upon the fact that appellant, over proper objection, was required upon his cross-examination to reply to certain questions propounded by the private prosecutor on behalf of the state. It appeared from the evidence that one Loren Collins, a son of deceased by her former marriage, who had died about a year prior to the death of deceased, had been afflicted with tuberculosis and

for a period of approximately 2 years before his death had made his home with his mother and appellant, and had been cared for by his mother in his illness. Upon cross-examination the private prosecutor, over proper objection, was permitted to ask the defendant with reference to the son, Loren Collins, as follows:

"Q. Well, you made an attempt to force him out of the house while he was lying sick with tuberculosis, didn't you?"

"Q. Didn't you go to Dr. McWhorter in this city and ask him if there was some way to get rid of this son, Loren Collins, while he was there with tuberculosis as it was too much work for you to take care of him?"

To both of these questions the defendant answered in the negative. The defendant testified upon cross-examination that he and the deceased were married in June, 1910, and that he also had been previously married, and had lived with his first wife in the state of New York, whereupon, over proper objection, the private prosecutor was permitted to have the defendant answer the following questions:

"Q. Was your wife dead when you married Mrs. Ferguson?"

The defendant answered that she was, and had been dead about a year when he married Mrs. Ferguson. He was then asked:

"Q. You hadn't been living with her for several years, had you?"

Which question, over objection, was answered in the affirmative. He was then asked:

"Q. When did you quit living with your first wife?"

And, over objection, answered that it was about 1908. He was then asked:

"Q. Is it, or is it not a fact, Mr. Ferguson, that you beat your first wife up and had to leave the state of New York in a hurry?"

And, over objection, answered: "No, sir."

That this was improper cross-examination of the defendant and highly prejudicial is too clear for any argument. If any precedent could be considered as required upon the point of law here involved, it is readily to be found in the holding of this court, in State v. La Mont, 23 S. D. 174, 120 N. W. 1104, which has been expressly cited and approved by this court on this point in Richardson v. Gage, 28 S. D. 390, 133 N. W. 692. 32 Ann. Cas. 534, and in State v. Kaufman, 46 S. D. 585, 195 N. W. 447.

[17]  It appeared from the evidence that one William Scott, a bróther of deceased, made his home with deceased and appellant, and had lived with them for several years.  Upon cross-examination the private prosecutor. was permitted, over proper objection, to require an answer from the defendant to the following question:

"Q. And 2·or 3 nights before Mrs. Ferguson's death, isn't it a fact that you and she were quarreling, and you heard William Scott get out of bed and come to the door, and you stopped suddenly?"

To which defendant answered:  "No, sir."

This ruling of the trial court was palpable error.  Of course, we do not hold that the state was not entitled to show quarrels between appellant and deceased 2 or 3 nights prior to her death if any such occurred.  Such testimony would have been highly material.  But such testimony was a part of the case in chief on the part of the state.  Certainly, if the state had shown that they had inadvertently omitted evidence of quarrels between appellant and deceased, or that they had learned of the existence of such evidnce after the close of their case, it would have been entirely within the sound discretion of the court to permit the state to reopen in chief and examine its witnesses on this point, but there is absolutely no claim here of inadvertent omission or of after-acquired information.  William Scott had previously testified on behalf of the state, and had not even been interrogated in any manner whatever as to any quarrels between defendant and deceased, nor was there· anywhere else throughout the entire record in this case any evidence whatever as to any quarrels between them at any time.  This was particularly noticeable in view of the promise of the state's attorney in his opening statement to the jury which we have previously quoted.  Under these circumstances, therefore, to permit this question upon cross-examination was manifestly erroneous, and could not but have been prejudicial to the rights of appellant.  It is true he answered the question in the negative and his denial was not controverted, but that does not avoid the essential vice of such cross-examination.  We quote from State v. La Mont, 23 S. D. 174, 120 N. W. 1104:

"Any juror might naturally conclude that there must be something in these questions, or they would not have been asked by

the prosecutor, even if the defendant did deny them. The jury would conclude naturally, under such circumstances, that defendant would deny the matters referred to in said questions even if they were true, and thus the jury would naturally consider matter wholly foreign to the issues in the case, matter that had not been proven either one way or the other in the case, but which had been injected into the case by way of insinuation on improper cross-examination, and which as a matter of fact, might be wholly without foundation, and which would naturally have a very damaging effect, by creating a prejudice against defendant that should not exist, and in a case where the vital facts are so closely contested."

[18] The sixth group of errors assigned by appellant are based upon claimed misconduct of the private prosecutor in connection with the cross-examination of appellant both in reference to the asking of the questions last above considered and other interrogation of appellant as shown by the record. If the private prosecutor did, in fact, believe that this objectionable cross-examination of the defendant was proper and upon material issues, and if it was based upon actual facts within the knowledge of the private prosecutor, then, particularly in view of the fact that the court had, over objection, admitted the testimony, both good faith and diligence would seem to require that the private prosecutor pursue the matter by means of the state's witnesses, and at least offer testimony on the part of the state in support of the insinuations he had endeavored to raise by this cross-examination. The entire absence of any such effort on the part of the state is conspicuous in this record. As we have previously said, William Scott was present and testified, but was never interrogated as to the matter of any quarrel between deceased and appellant. Doctor McWhorter testified at length in the case as a willing witness on behalf of the state, but was never interrogated as to any conversation between himself and appellant in reference to getting rid of the tubercular young man, Loren Collins. Under all the circumstances of this case, it is extremely difficult to avoid the plain inference that one or both of two situations existed, either that the private prosecutor knew that his cross-examination was improper as a matter of law and did not endeavor to follow it up for that reason, or that he had, in fact, no evidence whatever to

support the insinuations of his cross-examination, and deliberately asked these questions of the defendant without believing that they were founded upon fact. If the truth lies in either, or both, of these inferences, then it is hardly necessary for us to say that such conduct upon the part of the private prosecutor was highly improper and far from commendable. We quote again from State v. La Mont, supra:

"It is extremely doubtful if the state asked these questions under consideration in the case at bar for the purpose of ascertaining the intent of defendant, were such a question relevant. It appears from the record that the son, Delmar, and the daughter, Myra, mentioned and referred to in this cross-examination, both testified as witnesses on the trial, yet neither of them was interrogated by the state in relation to any of these matters referred to in the cross-examination, and therefore it would naturally be inferred therefrom that this cross-examination was solely for the purpose of prejudicing the defendant before the jury, rather than to ascertain the truth. It is the sting of the insinuation, wholly without foundation so far as the record discloses, that constitutes the real gist of the error."

[19] See, also, Hansen v. Boots, 41 S. D. 96, 168 N. W. 798. Our law contemplates that the trial of a criminal case shall be conducted on behalf of the state by a public officer, the state's attorney, and that it shall be conducted fairly, both as concerns the best interests of the public and the rights of the defendant. Neither the state's attorney nor the court should permit a privately employed and retained special prosecutor to turn the procecution of a public offense into a persecution. The situation in this case, as it appears from the entire record, moves us to reiterate our approval of the language of Walker, J., in State v. Moreaux, 254 Mo. 398, 162 S. W. 158, as previously quoted and approved by this court in State v. Flavin, 35 S. D. 530, 153 N. W. 296, Ann. Cas. 1918A, 713.

[20] Other assignments of error taken by the appellant go to matters which we deem unlikely to arise in the event of a new trial of the case, and we therefore consider it unnecessary to pass thereon.

[21] We have examined the entire record in this case with care and attention. It is undoubtedly true that, standing alone,

or under different circumstances, some of the errors hereinbefore pointed out might be held without prejudice and might not require a reversal. We are entirely mindful of the salutary rule of our statute as set out in section 5044, Code 1919, and often approved by this court, that mere technical error should not work a reversal, unless the substantial rights of the defendant have been clearly prejudiced. Under all the circumstances of the instant case, however, we are unable to escape the conviction that by reason of the errors hereinbefore set out the defendant did not receive that fair and impartial trial which is guaranteed him by the Constitution and laws of this state.

The judgment and order appealed from are reversed, and the case is remanded for a new trial.

Note.—Reported in 204 N. W. 652. See, Headnotes (1) and (2), American Key-Numbered Digest, Judges, Key-No. 40, 33 C. J. Sec. 132, Criminal law, 16 C. J. Sec. 556; (3) Constitutional law, Key-No. 250, 12 C. J. Sec. 954 (Anno.); (4) Criminal law, Key-No. 226, 1 6 C. J. Sec. 557, Judges, 33 C. J. Sec. 132; (5) Homicide, Key-No. 234(1), 30 C. J. Sec. 540; (6) Homicide, Key-No. 233, 30 C. J. Secs. 406, 539; (7) Criminal law, Key-No. 656(8), 16 C. J. Sec. 2103; (8) Criminal law, Key-No. 656(5, 8), 16 C. J. Secs. 2193, 2104, 2290; (9) Criminal law, Key-No. 552(3), 16 C. J. Sec. 1568; (10) Criminal law, Key-No. 552(4), 16 C. J. Sec. 1567; (11) Constitutional law, Key-No. 70(3), 12 C. J. Sec. 390; (12) Criminal law, Key-No. 655(4), 16 C. J. Sec. 2103; (13) Criminal law, Key-No. 1166½(12), 16 C. J. Sec. 2094; (14) Criminal law, Key-No. 855(4), 16 C. J. Sec. 2518, 17 C. J. Sec. 3714 (Anno.); (15) Criminal law, Key-No. 925(1), 16 C. J. Sec. 2669; (16) Criminal law, Key-No. 706, 16 C. J. Sec. 229; (17) Criminal law, Key-No. 1170½(2), 17 C. J. Sec. 3660; (18) Criminal law, Key-No. 706, 16 C. J. Sec. 2330; (19) Criminal law, Key-No. 669, 16 C. J. Sec. 2221; (20) Criminal law, Key-No. 1143(3), 17 C. J. Sec. 3543; (21) Criminal law, Key-No. 1186(4), 17 C. J. Sec. 3751.

The question as to whether treating jurors is ground for new trial or reversal, is discussed in notes in 19 L. R. A. (N. S.) 773, 49 L. R. A. (N. S.) 889.