STATE, Respondent, v. NEIMAN, Appellant

(12 N. W.2d 374.)

(File No. 8570.   Opinion filed December 28, 1943.)

**G. F. Johnson,** of Gregory, for Appellant.

**George T. Mickelson,** Atty. Gen., and **Charles P. Warren,** Asst. Atty. Gen., for Respondent.

POLLEY, J.   John Neiman, the defendant, was prosecuted and tried for the larceny of 8 small pigs in Gregory County, in April, 1942.   At the close of the testimony for the state and again at the close of all of the testimony, defendant moved for a directed verdict on the ground of the insufficiency of the evidence to support a verdict for the state,

and for the further reason that there is no evidence of guilty intent on the part of the defendant. The motion was denied, the verdict was guilty, and the defendant was sentenced to a term in the penitentiary.

It is not claimed that the defendant was present or took any part in the actual stealing of the pigs involved, but that he aided and abetted in the stealing of them and thereby became guilty as the principal in the commission of the criminal act.

The names and relationship of the various parties concerned in the crime under investigation in this case will be helpful in understanding the part taken in the transaction by the various parties.

William Sinkular, the owner of the pigs that were the subject of the larceny, lived one mile south of Dallas in Gregory County, Charles Neiman, father of the defendant, lived on a farm about half a mile from the Sinkular place. Ted Neiman was a brother of Charles Neiman and lived on a farm in the immediate neighborhood. John Neiman, the defendant, lived on a farm about 11 miles west of the Sinkular place. Clarence and Harlow Neiman were younger brothers of John's. Clarence was married and he and his wife worked out on various farms in the neighborhood, and Harlow was working for William Sinkular.

William Sinkular, above named, was the owner of a considerable number of small pigs, all about the same size and similar in appearance to the pigs that were stolen. These pigs were kept in a hog lot on the Sinkular farm near a highway and about half a mile from the house in which Sinkular lived. Mr. Sinkular became suspicious that some of his pigs had been stolen. He afterwards learned that there had been three separate thefts of pigs, the first of which took place at about 12:30 o'clock on the morning of March 3, 1942; but this theft is not involved in this case and need not be further mentioned.

The second theft occurred about 1:00 o'clock on the morning of March 19, 1942, at which time Clarence Neiman stole 5 of the Sinkular pigs. After stealing these pigs, Clar-

ence put them in the back end of his car and drove to the home of his father where his wife was staying that night and took her in his car and drove out to his brother John's place, arriving there at about 1:30 or 2:00 o'clock that morning. The defendant had gone to bed but Clarence got him up and asked him if he did not want to buy some pigs. The defendant said he would have to go out and see them first. Then he dressed himself and went out and looked at the 5 pigs Clarence had in his car. Clarence told John he bought the pigs from Harry Sinkular, and further told him that he (Clarence) paid $3 a head for them, part of which was in cash and the balance by giving him an old tire, and that he thought he ought to have at least $4 apiece for them. John thought the pigs were a good bargain at that price and bought them. He did not have the money to pay for them at the time, but later on that day he took two of his old sows to Gregory and sold them and in that way got money to pay Clarence for the pigs he had bought from him that morning.

On the evening of March 20, Clarence and Harlow Neiman, Harry Sinkular, and some other folks in the neighborhood, were at Ted Neiman's where they played cards until 12:00 o'clock or later, then departed for their respectives homes. As Clarence Neiman and his brother Harlow drove past the Sinkular hog lot, they stopped and stole 8 pigs, generally similar to the 5 pigs that Clarence had taken earlier in the week, except probably a little smaller in size. After they had these pigs in Clarence's car Harlow went to the Sinkular house and stayed there the rest of the night. Clarence drove to his father's place where his wife was staying that night, got her into his car and drove out to John's place where he awakened John, called him outside and sold the 8 pigs he had in the car to John at the agreed price of $3 apiece. These are the 8 pigs for the alleged stealing of which defendant is being prosecuted in this case.

Clarence Neiman, who did all of the stealing in the case, pleaded guilty and acted as a witness for the state at the trial. Harlow also testified for the state.

The Court instructed the jury as follows:

"XI. Our statute [Sec. 13.0203] provides that all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are equally guilty as principals in the commission of the offense.

"XII. As used in these instructions the words 'aid and abet' mean to encourage, counsel, incite or instigate to commit a crime, or assist in a criminal act. In other words, to aid and abet requires voluntary action in the commission of the offense.

"XIII. The mere fact that the defendant may have had knowledge that the offense had been committed, and if he did nothing to aid, abet, encourage or assist in the commission of the crime, he would not be guilty thereof."

While Clarence was on the witness stand he was asked the following question: "After you had delivered these hogs to John, (the defendant), did you have any talk with him about getting more? A. No, only he says he would buy more if I can buy them from Harry Sinkular for that price." And it is upon this bare statement and the surrounding circumstances that the whole case is built. But this proposition by the defendant is not conditioned upon the willingness or ability of Clarence to steal more pigs, but upon his ability and willingness to buy them from Harry Sinkular at the price he paid for the 5 pigs he had just sold to John. There is no direct evidence in the record that John knew or had any intimation at the time that he bought the 5 pigs, that the pigs had been stolen, and Clarence, to conceal from John the fact that the pigs had been stolen, told John that he bought the pigs from Harry Sinkular.

The state claims that the fact that the pigs were brought to John's house at 1:30 o'clock in the morning and that Clarence offered to sell them as cheaply as he did were circumstances from which John should have known that the pigs had not been come-by honestly.

The prosecution stresses the fact that the stolen pigs were found in the possession of the defendant immedi-

ately after they had been stolen as a circumstance tending to prove that defendant had stolen them. There is such a rule in larceny cases, but it has no application to this case. It is the theory of the prosecution, and the undisputed evidence on behalf of the state shows that the pigs were stolen by Clarence Neiman, and that the defendant obtained them by purchase and sale, and the fact that they were found in the possession of the defendant immediately after they had been stolen, is wholly immaterial.

Clarence and Harlow Neiman both of whom were witnesses for the state, and whose testimony appears to have been accepted as perfectly true; and who planned and did all the stealing, testified that John did not take any part in the stealing of the pigs or know anything about the intended stealing of the pigs until after they had been stolen and delivered to defendant in Tripp County on the morning of March 21.

The court charged the jury that in order to convict the ·defendant they must find from the evidence. and beyond a reasonable doubt that he aided or abetted the party who did the actual stealing, and that to aid and abet meant to encourage, counsel, incite or instigate to commit a crime, or assist in a criminal act; or in other words, that to aid and abet requires voluntary action by the accessory in the commission of the crime.

■■ As we have indicated the whole case for the state rests upon the theory that the defendant knew that the five pigs first received from Clarence were stolen from Sinkular, and that he intended to encourage Clarence to steal more ·of those pigs and bring them to him when he said in substance that he would buy more pigs at that price. That all ·of the circumstances are consistent with guilt we do not doubt. This is not enough. In State v. Guffey, 39 S. D. 84, 163 N. W. 679, 682, this court approved an instruction of the trial court as follows: "* * * 'to warrant a conviction for crime on circumstantial evidence alone, the circumstances taken together should be of a conclusive nature, and leading on the whole to a satisfactory conclusion, and point-

ing to a moral certainty that the accused committed the offense charged; and it is invariably the rule of law that, to warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with each other, and consistent with the guilt of the party charged, and such as cannot by any reasonable theory be true and the party charged be innocent; and in this case, if all the facts and circumstances relied upon by the state to secure a conviction can be reasonably accounted for upon any theory consistent with the innocence of the defendant, then the jury should acquit the defendant.' "

To hold the exhibited circumstances are sufficient, is to hold that they will not support an inference that John believed Clarence when he said he purchased the pigs from Harry Sinkular and paid for them, part with cash and the balance with a secondhand tire. We think it reasonably possible that John may have believed his brother, and that therefore a holding that the proved circumstances are "such as cannot by any reasonable theory be true and the party charged be innocent," is not warranted. This rule has been followed by this court in the following cases: State v. Guffey, supra; State v. Guffy, 50 S. D. 548, 210 N. W. 980; State v. Giffen, 64 S. D. 430, 267 N. W. 229; State v. Schelske, 64 S. D. 574, 269 N. W. 81; State v. Czerney, 61 S. D. 172, 247 N. W. 376; State v. Tarbell, 64 S. D. 330, 266 N. W. 677; State v. Ferguson, 48 S. D. 346, 204 N. W. 652; State v. Coleman, 17 S. D. 594, 98 N. W. 175. Under this rule the evidence is not sufficient to support the verdict in this case.

The order and judgment appealed from are reversed.

WARREN and SMITH, JJ., concur.

ROBERTS, P.J., and RUDOLPH, J., dissent.