STATE of South Dakota, Plaintiff
and Appellant,

v.

Mark WINCKLER, Mike Weston, Jesse
Costello, Mike Honomichl, Jim Weddell,
Donald Cournoyer, and Godwin Weston,
Defendants and Respondents.

STATE of South Dakota, Plaintiff
and Respondent,

v.

Mark WINCKLER, Mike Weston, Jesse
Costello, Mike Honomichl, Donald Cour-
noyer, and Godwin Weston, Defendants
and Appellants,

and

Jim Weddell, Defendant.

STATE of South Dakota, Plaintiff
and Respondent,

v.

Jim WEDDELL, Defendant
and Appellant,

and

Mark Winckler, Mike Weston, Jesse Cos-
tello, Mike Honomichl, Donald Cournoy-
er, and Godwin Weston, Defendants.

Nos. 11787, 11790, 11791, 11796, 11798,
11801, 11802 and 11973.

Supreme Court of South Dakota.

Argued Jan. 11, 1977.

Decided Nov. 17, 1977.

Rehearing Denied Dec. 16, 1977.

John P. Guhin, Asst. Atty. Gen., Pierre, for plaintiff and appellant State of South Dakota; William Janklow, Atty. Gen., Pierre, on brief.

Terry L. Pechota, Mission, for defendant and appellant Jesse Costello.

Carl Haberstick, Parkston, for defendant and appellant Mike Honomichl.

Richard D. Hagerty, Yankton, for defendant and appellant Godwin Weston.

John W. Keller, Chamberlain, for defendant and appellant Mark Winckler.

Frank J. Brady, Yankton, for defendant and appellant Jim Weddell.

James W. Abbott, Yankton, for defendant and appellant Mike Weston.

William J. Klimisch, Yankton, for defendant and appellant Donald Cournoyer.

WINANS, Justice.*

Sometime during the night of May 1, and the early morning hours of May 2, 1975, the Coast-to-Coast store in Wagner, South Dakota was burglarized. Several weapons, including rifles and shotguns, were taken from the store, along with some ammunition. At approximately 3:00 a. m. on May 2, the seven defendants, who were armed, broke into the Yankton Sioux Tribe Pork Plant [hereinafter Pork Plant]; they occupied the Pork Plant until 8:30 p. m. that same evening when the seven finally surrendered to authorities.

The authorities had surrounded the Pork Plant at approximately 7:00 a. m. on May 2. During the day several shots, coming from the Pork Plant, were fired at them. After the surrender, the weapons taken from the Coast-to-Coast store were found in the Pork Plant; no other persons were found on the premises.

Defendants were charged with burglary in violation of SDCL 22-32-9, grand larceny in violation of SDCL 22-37-1, and three counts of assault with a dangerous weapon, without intent to kill, in violation of SDCL 22-18-11. The assault charges were dismissed by the trial court prior to trial for want of jurisdiction. Defendants were tried conjointly on the burglary and larceny charges and a jury found them guilty of both charges. Defendants appeal from the

* In accordance with SDCL 16-1-5.

judgment of conviction. The state appeals from the order dismissing the three counts of assault with a dangerous weapon. We deal with the state's appeal first.

■■■ A state's sovereignty over its own territory is plenary and yields only in matters that fall within the constitutional scope of exclusive federal jurisdiction. *State v. Smith,* 26 Or.App. 49, 552 P.2d 261 (1976). It is well established that crimes committed by Indian people within Indian Country are matters of exclusive federal jurisdiction and state courts therefore have no power over those crimes. *Application of DeMarrias,* 77 S.D. 294, 91 N.W.2d 480 (1958).[1] See also *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *White v. Schneckloth,* 56 Wash.2d 173, 351 P.2d 919 (1960). While this court has ruled that the Yankton Indian Reservation was disestablished, *State v. Williamson,* 87 S.D. 512, 211 N.W.2d 182 (1973), trust land is still Indian Country as defined by 18 U.S.C. § 1151.[2] *DeCoteau v. District County Court,* 87 S.D. 555, 211 N.W.2d 843 (1973), affirmed 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). It is undisputed that the seven defendants are Indian people; it is also admitted that the Pork Plant is on trust land. Because the alleged shooting originated from trust land, the trial court concluded that any alleged assault occurred in Indian Country and jurisdiction properly lay with the federal government.

■■■ However, the fact that an offense originated outside the state's jurisdiction does not necessarily deprive the state of jurisdiction. A state can exercise jurisdiction to punish any criminal offense committed in whole or in part within that state.[3] *People v. Kirby,* 42 Mich.App. 97, 201 N.W.2d 355 (1972). State jurisdiction properly lies when acts done outside its jurisdiction are intended to produce and do produce a detrimental effect within that jurisdiction. *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255 (1973). The law holds that a crime is committed where the criminal act takes effect. *Simpson v. State,* 92 Ga. 41, 17 S.E. 984 (1893). And this holds true even though the accused is never actually present within the state's jurisdiction. *State v. Brundage,* 53 S.D. 257, 220 N.W. 473 (1928). One who puts in force an agency for the commission of a crime is deemed to have accompanied the agency to the point where it takes effect. The state is then justified in punishing the cause of the harm as if he were in fact present at the effect should it ever succeed in getting him within its power. *Strassheim v. Daily,* 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911); *Rivard v. United States,* 375 F.2d 882 (5th Cir. 1967); *People v. Anonymous,* 52 Misc.2d 772, 276 N.Y.S.2d 717 (1965); *Simpson v. State, supra.* Admittedly the doctrine of constructive presence is a legal fiction, but it is a fiction necessary to the practical administration of criminal justice.

"[T]here may be a constructive presence in a State, distinct from a personal presence, by which a crime may be consummated. And if it may be consummated it

---

1. SDCL 23–9–4 provides:

 "Exclusive jurisdiction and authority to arrest, prosecute, convict, and punish all persons who shall commit any act in violation of the penal laws of the United States upon any Indian reservation within this state shall be given and relinquished to the United States and the officers and courts thereof, whenever such jurisdiction shall be assumed by the United States."

2. Indian Country includes Indian allotments or trust land:

 "Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. June 25, 1948, c. 645, 62 Stat. 757; May 24, 1949, c. 139, § 25, 63 Stat. 94."

3. SDCL 23–9–12:

 "All persons who commit, in whole or in part, any crime within this state are liable to punishment under the laws of this state."

may be punished by an exercise of jurisdiction; that is, a person committing it may be brought to trial and condemnation. And this must be so if we would fit the laws and their administration to the acts of men and not be led away by mere 'bookish theorick.'" *Hyde v. United States,* 225 U.S. 347, 362–63, 32 S.Ct. 793, 800, 56 L.Ed. 1114 (1912).

■ South Dakota deals with this problem by statute. SDCL 23–9–10 provides:

"When the commission of a public offense commenced without this state is consummated within its boundaries, the defendant is liable to punishment therefor in this state, and though he were out of the state at the time of the commission of the offense charged, if he consummated it in this state through the intervention of an innocent or guilty agent or by any other means proceeding directly from himself; and in such case the jurisdiction is in the county in which the offense is consummated."

The question facing us is whether the crime alleged—assault with a dangerous weapon, without intent to kill—is consummated within the jurisdiction of the state.[4] If the crime is consummated when the trigger is pulled, jurisdiction properly lies with the federal government under 18 U.S.C. § 1153 [assault with a dangerous weapon]. However, if the assault continues beyond the act of firing the weapon, the state may properly exercise jurisdiction.

■ Defendants were charged in the information as follows: "[Defendants] did commit the public offense of Assault With A Dangerous Weapon Without Intent To Kill (SDCL 22–18–11) in that they * * *

committed an assault * * * by shooting * * * with a firearm with intent to injure * * *, but without intent to kill * * *." Simple assault is an essential criminal element in this allegation.[5] See *State v. Grimes,* S.D., 237 N.W.2d 900 (1976); *People v. Odell,* 1 Dak. 197, 46 N.W. 601 (1875). Assault is defined as "any willful and unlawful attempt or offer, with force or violence, to do a corporal hurt to another." SDCL 22–18–1. Breaking down this definition, we see that an assault may be committed by one of two methods. It may either be an attempt to commit a battery or an offer to commit a battery.

■ As an offer to commit a battery the assault is completed when the object of the offer is put in fear of the immediate bodily injury under circumstances which would produce fear in the mind of an ordinary man. *State v. Mier,* 74 S.D. 515, 55 N.W.2d 74 (1952); *State v. Wiley,* 52 S.D. 110, 216 N.W. 866 (1927). Fear of immediate bodily injury need not be shown in instances where the assault consists of an attempted battery. All that is required under the latter definition is some overt act toward commission of the battery. 1 Wharton's Criminal Law and Procedure, § 332, at 678 (1957). But see *State v. Archer,* 22 S.D. 137, 115 N.W. 1075 (1908). We need not decide which definition of assault should apply under these facts, however, because we find that the state would have jurisdiction in either instance.

■ Viewing the alleged assault as an attempted battery, we find that the crime would be consummated in state jurisdiction. That is the place where the object of the

---

**4.** We construe "consummated" by its ordinary and plain meaning. "To finish by completing what was intended; bring or carry to utmost point or degree; carry or bring to completion; finish; perfect; fulfill; achieve." Black's Law Dictionary 389 (4th ed. 1968). Accord Webster's New Collegiate Dictionary 244 (1973).

**5.** Defendants argue that the state seeks to change its theory of the case in an attempt to get jurisdiction. They urge that when the state charged the offense of shooting at another with intent to do bodily harm [SDCL 22–18–11], it elected the theory of the case and is now bound

by that election. *State v. Sudrala,* 79 S.D. 587, 116 N.W.2d 243 (1962); see also *State v. Wurdemann,* 265 Minn. 92, 120 N.W.2d 317 (1963). However, the essence of the crime charged is still an assault with a dangerous weapon. The allegation of assault by shooting a firearm at another is but an instance of assault with a dangerous weapon. See *State v. Grimes,* S.D., 237 N.W.2d 900, 903 (1976). Therefore, we find assault to be a relevant question under either form of an allegation under SDCL 22–18–11.

attempted battery is found. In this vein we find the reasoning of the court in *Simpson v. State,* 92 Ga. 41, 17 S.E. 984 (1893) to be persuasive. There the accused was convicted of shooting at another. At the time of the shooting, the accused was standing in South Carolina and the prosecutor was in a boat situated in waters under the jurisdiction of Georgia. The court held that Georgia had jurisdiction over the offense. "The law deems that a crime is committed in the place where the criminal act takes effect. * * * [W]here one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual." 17 S.E. at 985. The court concluded that the crime became effectual where the intended victim was located, the place where the bullets hit. The crime is complete when the criminal agent, the bullets, cease to move. That the bullet failed to achieve the desired effect is of no consequence; it nevertheless had an effect in state jurisdiction.

Viewing the alleged assault as an offer to commit a battery, it may not be denied that any fear of bodily harm necessarily occurred in state jurisdiction. That is where the intended victim experienced apprehension because the bullets were landing around him. The crime is consummated where the intended victim is put in fear of immediate bodily harm. *State v. Mier, supra.*

The defendants are charged with placing in force a criminal agency and are deemed to accompany that agency to the point where it becomes effectual. *Simpson v. State, supra.* Under either definition, the assault alleged in the information was consummated in state jurisdiction. Therefore, we hold that the State of South Dakota could properly exercise jurisdiction over the alleged violation of SDCL 22-18-11. The order of the trial court dismissing the three counts of assault with a dangerous weapon, without intent to kill, is accordingly reversed and this portion of the matter is remanded for further proceedings not inconsistent with this opinion.

We turn now to the questions raised by the defendants on appeal from their conviction of burglary and grand larceny. It is urged on behalf of four of the defendants that the circuit court had no jurisdiction to try them for these offenses.[6] They argue that their only guilt can be as aiders and abettors. Because these defendants never left trust land,[6a] they contend that jurisdiction over the aiding and abetting in the state crimes properly lies with the federal government.

■ Assuming that defendants' contention that they are guilty only as aiders and abettors is supported by the evidence, an assumption that the state disputes, we find that the circuit court had jurisdiction even though they never physically left Indian Country.

"Only a constructive presence is necessary to sustain a charge against a defendant as an aider or abettor * * * in the commission of a criminal offense. * * * The law is well settled to this effect everywhere. One may be entirely out of the jurisdiction of the court, in another state, in person, and still be constructively present in the jurisdiction where the criminal transaction takes place." *Watson v. State,* 158 Tenn. 212, 12 S.W.2d 375, 377 (1928). *Accord State v. Brundage, supra*; SDCL 23-9-10. See also *Ex Parte Morgan,* 86 Cal.App.2d 217, 194 P.2d 800 (1948); *Newton v. People,* 96 Colo. 246, 41 P.2d 300 (1935); *State v. Owen,* 119 Or. 15, 244 P. 516 (1926).

■ One who aids and abets is guilty as a principal. *State v. Bonrud,* S.D., 246 N.W.2d 790 (1976). He is deemed to accompany the principal to the place where the criminal offense occurred. *State v. Brund-*

---

**6.** Jesse Costello, Michael Honomichl, Mike Weston, and Godwin Weston.

**6a.** The sole source of any claim that the four defendants never left trust land came from the Dusenberry statement. Although the statement was before the court on the motion to dismiss for lack of jurisdiction, the statement was never received in evidence during the trial, nor did Dusenberry testify at trial.

*age, supra; Watson v. State, supra*; SDCL 23–9–10. Here, although four defendants never physically left Indian Country, the law holds they were constructively present at the scene of the crime. Therefore, the circuit court had jurisdiction to try them for the offenses alleged in the information.

Defendants next contend that the court was without jurisdiction over them because they were illegally arrested. The record shows that the arrest was made by Captain Bob Long of the Bureau of Indian Affairs. Defendants assert that Captain Long's arrest authority in Indian Country stems from the 25 Code of Federal Regulations § 11.15.[7] They argue that under this authorization Indian police are not authorized to arrest for state crimes. Alternatively, they claim that state police have no authority to make arrests in Indian Country for state crimes. Although it is not clear from the record exactly on what charge defendants were taken into custody, we will assume that defendants' contentions are correct and that the arrest was therefore illegal. This presents the court with two problems stemming from the illegality of the arrest.

■■■ The first contention is that the weapons seized at the Pork Plant, admittedly seized without a warrant, were taken incident to an unlawful arrest. Therefore, defendants conclude that the weapons should be suppressed. See *State v. Glick*, 87 S.D. 1, 201 N.W.2d 867 (1972); *State v. Thunder Horse*, 85 S.D. 76, 177 N.W.2d 19 (1970). However, defendants have no standing to challenge the validity of the search. They were mere trespassers on the premises of a building owned by the Yankton Sioux Tribe. Trespassers are without standing to contest the validity of a search of another's premises. *State v. Merrill*, 82 S.D. 609, 152 N.W.2d 349 (1967). See also *State v. Eppley*, 282 N.C. 249, 192 S.E.2d 441 (1972); *State v. Coty*, Me., 229 A.2d 205, 33 A.L.R.3d 1 (1967). That rule is not altered by the fact that defendants as mem-

bers of the Yankton Sioux Tribe were also shareholders in the operation of the Pork Plant. The record shows that defendants had no permission to be on the premises. Any standing the corporation may have to object to the warrantless search is not vicariously extended to individual shareholders. *Lagow v. United States*, 159 F.2d 245 (5th Cir. 1947). As a result defendants are trespassers without any expectation of privacy as to evidence found on the premises of another. *United States v. Culver*, 224 F.Supp. 419 (D.Md.1963). The trial court did not err in refusing to suppress the evidence.

■■■ Because the arrest was illegal, defendants next contend that they were illegally brought within the jurisdiction of the State of South Dakota. They conclude that charges should therefore be dismissed. However, we find the rule to be otherwise.

"When a person accused of a crime is found within the territorial jurisdiction wherein he is so charged and is held under process legally issued from a court of that jurisdiction, neither the jurisdiction of the court nor the right to put him on trial for the offense charged is impaired by the manner in which he was brought from another jurisdiction, whether by kidnapping, illegal arrest, abduction, or irregular extradition proceedings." 4 Wharton's Criminal Procedures § 1484, at 39–40 (1957).

Accord, *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. State of Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Waits v. McGowan*, 516 F.2d 203 (3d Cir. 1975); *State v. Johnson*, 277 Minn. 230, 152 N.W.2d 768 (1967); *Crouse v. State*, Wyo., 384 P.2d 321 (1963). Although the rule is not without its critics, *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), we have adopted it in this state and are not now persuaded to deviate from it. See *State v. Thunder-*

---

7. 25 C.F.R., § 11.15 provides in part:
 "No member of the Indian police shall arrest any person * * * except when such offense shall occur in the presence of the arresting officer or he shall have reasonable evidence that the person arrested has committed an offense."

*shield*, S.D., 242 N.W.2d 159 (1976). It is no defense in a criminal prosecution that defendants were illegally brought before the court. The trial court did not err in refusing to dismiss the charges.

■ Defendants also seek reversal because Judge Kern refused to recuse himself from presiding over the arraignment; affidavits of prejudice had been filed against the judge immediately prior to commencement of the arraignment. Although another judge was present in the court room who could have presided at the arraignment, Judge Kern refused to step down, justifying his refusal by holding that the affidavits were not timely. The recusal provision in effect at the time the affidavits were filed was SDCL 23–28–8: [8]

"If the defendant in a criminal action prosecuted in the circuit court by indictment or information shall make affidavit that he cannot have an impartial trial by reason of the bias or prejudice of the presiding judge of the circuit court where the indictment or information is pending, the judge of such court must call some other judge of the circuit court to preside at said trial * * * and do any other act with reference thereto as though he were presiding judge of said circuit court. If said affidavit shall be filed at least twenty days before the term of court at which said case is for trial, the clerk shall forthwith transmit a copy thereof to the presiding judge of the Supreme Court, who shall forthwith designate the judge to try said case."

Defendants contend that the judge was required to step down by virtue of this statute because he loses all jurisdiction to legally proceed in the criminal action. They rely on *State v. Finder*, 12 S.D. 423, 81 N.W. 959 (1900) to that end. The difficulty with defendants' reliance on SDCL 23–28–8 and the cases interpreting its precursors [9] is that the statute has no relation to proceedings under consideration. The statute is aimed at insuring that defendants receive a fair and impartial trial. The fear is that the jurors may be swayed by the bias or prejudice of the judge asked to step down. However, an arraignment contains none of those trappings.[10] We find that SDCL 23–28–8 applied only to the actual trial of the criminal case and did not require the judge to step down in this pretrial proceeding.[11] See *State v. Ferguson*, 48 S.D. 346, 204 N.W. 652 (1925).

■ Defendants next claim that it was error to refuse to grant them separate trials. Granting or denial of a motion for separate trial made pursuant to SDCL 23–42–4 is a matter that lies within the sound discretion of the trial court. We will not disturb that exercise of discretion absent a showing of abuse. *State v. Bonrud*, S.D., 246 N.W.2d 790 (1976). Defendants are required to make a particularized showing as to any possible prejudice resulting from a refusal to sever trials. *State v. Strickland*, 87 S.D. 522, 211 N.W.2d 575 (1973).

■ Defendants attempt to demonstrate prejudice by claiming that exculpatory testimony of codefendants would have been available to them had a severance been granted. In reaching our conclusion on whether the deprivation of an opportunity to use the exculpatory testimony of a codefendant amounts to prejudice resulting in denial of a fair trial, we find the guidelines established by the court in *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir. 1970) most helpful.

1) "There is no duty to sever merely because potentially exculpatory testimo-

---

**8.** Recusal is now covered by SDCL 15–12, by virtue of Supreme Court Rule 75–5, effective Jan. 1, 1976.

**9.** See e. g., *State v. Thompson*, 43 S.D. 425, 180 N.W. 73 (1920); *State v. Palmer*, 4 S.D. 543, 57 N.W. 490 (1894).

**10.** This is especially true in this case. The only action taken by Judge Kern was reception of the pleas of not guilty. Even assuming it was improper for the judge to refuse to step down, defendants would be hard-pressed to show prejudice to a substantial right. *State v. Finder*, 12 S.D. 423, 81 N.W. 959 (1900).

**11.** The statutes currently in force may yield a different result. See e. g., SDCL 15–12–27.

ny of a codefendant exists. The defendant-movant must desire to use it." 428 F.2d at 1020.

2) "It must be shown that the testimony would be exculpatory in effect. * * The movant must make a clear showing of what the codefendant would testify to." 428 F.2d at 1020 (citations omitted).

3) "A third inquiry may be into the likelihood that the codefendant will be willing to testify if the defendant is tried separately. * * * The court is not required to sever where the possibility of the codefendant's testifying is merely colorable or there is no showing that it is anything more than a gleam of possibility in the defendant's eye." 428 F.2d at 1021–22.

The record reflects defendants' desire to use the potentially exculpatory testimony of their codefendants. Assuming that the stated record constitutes a "clear showing" that such testimony would be exculpatory in effect, defendants have wholly failed to show that any of the codefendants would be likely to testify should severance be granted.[12]

" 'The mere assertion that a codefendant might be willing to exculpate a defendant is purely speculative. The absence of substantial proof that a codefendant would be willing to testify for the defendant at a later date is, in itself, grounds for denying a motion for severance.' * * * " *State v. Erickson,* N.D., 231 N.W.2d 758, 763 (1976) (citations omitted).

Accord *United States v. Wilson,* 500 F.2d 715 (5th Cir. 1974).

Defendants Weddell and Mike Weston assign error to the court's refusal to grant them separate trials because their appointed counsel were members of the same law firm. This state of affairs was brought to the court's attention at the arraignment conducted on July 18, 1975. At that time the judge asked both defendants if they had been advised of the potential conflict. They indicated that they were so advised and that they wished to have counsel continue to represent them. It was not until the state had presented its case that the defendants asserted that there was a conflict which prejudiced their respective defenses.

For purposes of this discussion we treat the question of two appointed counsel from the same firm representing codefendants the same as we would representation of codefendant by a single attorney. To sustain their burden in seeking reversal, defendants must show prejudice attributable to an actual conflict of interest arising in this case which impaired the effective assistance of appointed counsel. *State v. Goode,* 84 S.D. 369, 171 N.W.2d 733 (1969). There has been no showing of an actual conflict arising from the dual representation in this case. What defendants really complain of is the problem they face with regard to using the testimony of codefendants. This problem exists regardless of who represented the various defendants. The simple truth is that defendants chose not to testify or present a defense and refused to give their attorneys permission to seek a severance. There is no evidence

---

**12.** At the time that the defendants first moved to sever, immediately prior to trial, the court found the motions untimely because not filed at the pre-trial motions hearing conducted a month earlier. However, there was no evidence at that time that would constitute a clear showing that any testimony would be exculpatory. Defendants assert that the affidavits in support of the motion for separate trial filed by Cournoyer and Costello clearly show that both would testify. The court has examined both affidavits and does not even find an assertion that either defendant would testify if the trial were severed, much less substantial proof of willingness to testify.

Defendants also moved to sever at the end of the jury selection and at the end of the state's case, relying both times on a statement made by Dusenberry, apparently one of the participants in the alleged criminal activities. The state had moved to add his name to the information prior to trial but the motion was denied by virtue of defense resistance. Even assuming that the Dusenberry statement was properly before the court for consideration in connection with the motion to sever, and assuming it is exculpatory of some of the defendants, there is no showing that he would be willing to testify for the defense.

that they were forced to this course because two attorneys from the same law firm represented codefendants. The trial court did not err in refusing to grant severance.

Defendants moved for a directed verdict at the end of the state's case. The trial court allowed the question of their guilt to go to the jury based on the inference or presumption that is said to arise when one is found in possession of recently stolen property. Defendants do not dispute the inference; they contend it has no application here because the state has failed to establish the fact of possession upon which the inference is based.

"It has long been the rule in this state that possession of recently stolen property is, in itself, a circumstance from which guilt may be presumed. * * * The fact of such possession alone, if unexplained by the facts and circumstances brought out at trial, is a sufficient circumstance upon which to rest a verdict of guilty, if it convinces the jury of the defendant's guilt beyond a reasonable doubt." *State v. Larkin,* 87 S.D. 61, 202 N.W.2d 862, 865 (1972) (citations omitted).

Defendants argue that guilt beyond a reasonable doubt cannot be established where the inference of guilt is itself based upon an inference, that of possession. Because no one actually saw defendants in possession of the stolen weapons and because there were no identifiable fingerprints on those weapons, defendants conclude that possession can only be inferred and the trial judge should have kept the question of guilt from the jury; basing an inference upon an inference allows the jury to speculate as to defendants' guilt.

The burden is upon the state to establish every element of the crime beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). This includes proof of possession. "The possession that will activate the inference of guilt may be established by circumstantial evidence." *United States v. Johnson,* 140 U.S.App.D.C. 54, 433 F.2d 1160, 1165 (1970). Admittedly this allows the jury to infer possession; however, not all double inferences are constitutionally infirm. We find the inference is of sufficient strength to avoid the spectre of speculation through the double inference. The evidence of possession is that the defendants broke into the Pork Plant, all carrying weapons. The number of weapons stolen corresponds approximately to the number of people the evidence showed in the Plant. They were the only persons found in the Pork Plant when they surrendered to authorities. The stolen weapons were immediately thereafter found in the Pork Plant which was held by defendants throughout one whole day. Although circumstantial, the evidence of possession is of comparable persuasiveness to any direct evidence short of defendants being caught with the weapons in their hands. *Davis v. State,* Alaska, 499 P.2d 1025 (1972), reversed on other grounds, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). It was of sufficient strength to permit the jury to find possession by the defendants beyond a reasonable doubt.

Defendants insist that others had opportunity to bring those weapons into the Pork Plant. The evidence shows their takeover was in the early morning hours of May 2. The Plant was not sealed off until approximately 7:00 a. m.; defendants contend therefore that equal access by others prevents their possession from being exclusive. We are not persuaded by arguments of mythical intervenors. Proof of possession is a circumstance which should be left to the jury. *State v. Lewis,* Iowa, 242 N.W.2d 711 (1976). Although there is no showing that defendants had exclusive possession between the time of the burglary until the Pork Plant was sealed off, we find that this is simply a factor going to the weight of the evidence. *State v. Ponthier,* 92 Idaho 704, 449 P.2d 364 (1969). The circumstances justify a jury conclusion that possession was exclusive. The trial court did not err in refusing to direct the verdict.

We find the evidence sufficient to support the verdict.

"The rule that circumstantial evidence must be of such a character as to be inconsistent with any reasonable hypothesis of innocence is one for the guidance of the jury in considering circumstantial evidence in a criminal case. * * * It does not mean that defendants may escape conviction merely by presenting a set of facts for their defense which is not inconsistent with the state's evidence." *State v. Shank*, S.D., 226 N.W.2d 384 (1975).

The circumstantial evidence if believed by the jury is sufficient to sustain a finding of guilt beyond a reasonable doubt.

 Defendants next urged that a variety of remarks made throughout the course of the trial were so prejudicial that a reversal was warranted based on any of the allegedly prejudicial remarks. First is the reference made to the possibility of an alibi defense. The prosecutor in his opening statement told the jury that "all the defendants have filed notice they intend to rely upon alibi witnesses." An objection immediately followed that this was completely irrelevant and improper as an opening statement. The trial court agreed and instructed the jury to completely disregard the remarks concerning any alibi. No request for mistrial was made. Any error arising from this comment was corrected by the trial court's instruction, to which the defendants neither objected nor requested further supplementation. *State v. Gayton*, 83 S.D. 141, 155 N.W.2d 919 (1968); see also *People v. Tunstill*, 54 Mich.App. 254, 220 N.W.2d 703 (1974).

 In his opening statement, the prosecutor alluded to statements made by one of the defendants to the effect that the defendants were the only ones in the building. This statement had not been supplied to the defense during pretrial discovery, and there had been no showing of "voluntariness" or compliance with *Miranda*. The statement was objected to and the trial court admonished the jury that the prosecutor's statements were not evidence and ordered them to disregard his remarks. Out of the hearing of the jury, the judge informed the prosecutor that he would not be allowed to place the evidence of the statement before the jury.

We feel the court's actions were sufficient to cure any error that resulted from the prosecutor's remarks (*Frazier v. Cupp*, 1969, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; *People v. Hernandez*, 1970, 11 Cal.3d 481, 89 Cal.Rptr. 766, 771). An earlier motion by the State to add a witness' name to the information had been denied by the court, and the defense attorneys raised the point that a mistrial would allow the prosecutor to retry the case with the new witness on the information, thus implying that the prosecutor may have been deliberately seeking a mistrial by his conduct. We are not convinced, and we find any error on this point to be harmless. SDCL 23–1–2.

 Defendants also argue that a reference to the American Indian Movement (A.I.M.) by one of the prosecution's witnesses was so highly prejudicial that it required the court to declare a mistrial. We do not find error in the trial court's refusal to do so. Defendants reason that the mere mention of this group is enough to raise an inference of their membership, an inference prejudicial to a fair trial. This is indeed a strange argument coming from counsel who mentioned this very organization by name on several occasions during voir dire. By way of contrast, the reference by the prosecution's witness was totally unresponsive to the question asked. The jury was admonished to disregard the reference. This was not a case of prosecutorial misconduct aimed at inflaming the passions of the jury. See, e. g., *United States v. Sanchez*, 482 F.2d 5 (5th Cir. 1973). Rather it is an example of an unsolicited, unresponsive answer by a witness. The court did not abuse its discretion in refusing to grant a mistrial.

 Defendants assert that a mistrial was also the only cure for the alleged prejudice injected by the testimony of prosecution witness Huebbling. The witness testified that defendants broke into the Pork Plant, pointed guns at him, hit him with a gun, and held him captive. Defendants

protest that this is evidence of other criminal activity, the probative value of which is far outweighed by prejudicial impact. *State v. Pickering*, S.D., 217 N.W.2d 877 (1974). The trial court permitted a motion to strike the testimony about defendants' pointing guns at the witness. After the witness' comment that he had been hit, the defendants moved for a mistrial. The court refused to declare a mistrial but cautioned the witness to be responsive and instructed the jury to disregard his remark. Considering the dilemma facing the court, we do not find this an abuse of discretion.

The court recognized early in the proceedings that the state would have to delve into some aspects of the Pork Plant takeover to prove its prima facie case. The court also realized the possibility of prejudice to the defendants should this subject be pursued to any great length. Therefore, the court restricted evidence of the takeover to only those matters relevant to the question of possession of the weapons. The jury was instructed several times that occurrences at the Pork Plant were beyond the scope of their consideration. However, those incidents were so intertwined with the state's proof of the burglary and larceny charges that some mention of them was inevitable. The scope permitted by the trial court was not error. *State v. Bonrud*, S.D., 246 N.W.2d 790 (1976). The unsolicited remarks made by this witness were not so prejudicial that the court's instruction could not cure any potential harm. There is no error in refusing to grant a mistrial.

■ Defendants also moved for a mistrial when the state asked a witness whether it was difficult to take fingerprints in a business establishment. No positive prints had been lifted linking the defendants to the scene of the burglary. This was known prior to the trial. However, the witness had testified in answer to a general question that he had lifted prints at the scene. The defendants argue that this is an attempt to place them at the scene by innuendo. Any possible prejudice was cured on cross-examination, however, when defense counsel elicited the fact that defendants' fingerprints were not found at the scene.

■ During the state's closing argument counsel for one of the defendants moved for mistrial. As all the attorneys were making their way to the judge's chambers, co-counsel for the state accused a defense attorney of taking a "cheap shot" at him. Defendants urged the judge to inquire of the jury whether they heard the remark, asserting it was grounds for mistrial if they had. The judge, recognizing the possibility of prejudice resulting from such an inquiry, conducted an independent inquiry to determine if the jury had overheard the remark. The judge inquired of his court reporter and a DCI investigator, both sitting closer to the comments than was the jury, whether they heard any of this conversation. Neither had, nor had these comments been heard by one of the defense counsel or the prosecutor both of whom were sitting closer to the conversation than was the jury. Although one defense counsel did submit an affidavit stating he had heard the comment, we do not find that the court erred in refusing to examine the jury or in refusing to grant a mistrial. The court has wide discretion in conducting a trial and we will not interfere unless there has been an abuse of discretion that denies defendants a fair trial. There is no such abuse in this instance.

Finally defendants complain of comments made by the prosecutor during closing arguments. Defendants allege that certain remarks made by the state directed the jury's attention to defendants' failure to testify, and therefore, a mistrial was warranted.

The following are the comments complained of:

"But now, there is one thing that is missing from this whole thing I think that everybody seems to be overlooking; these people seem to indicate to you there has got to be some other independent witnesses that are responsible for this. They have the right to call them."

\* \* \* \* \* \*

"Basically, did anyone give you any facts, was there any facts to justify what they said? The State produced the facts."

\* \* \* \* \* \*

"Again, I would state that these, the defendants, have the power of subpoenaing a witness. If such an explanation is available they had an opportunity to call such independent witness to establish this."

\* \* \* \* \* \*

"Well, now the defendants come here and say 'No, not so'. They just say no, it is not so, that is the only thing they have done. They say it is not so without relying on any evidence of their own."

\* \* \* \* \* \*

"And the evidence in this case at least—and it is unexplained any other way, is to the effect that these people were together at all times, they came into this plant together, they were together when they left the plant that night, they stayed together all that time. There isn't any inference that there was—there is no evidence or circumstances to indicate anything else."

The defendants maintain that these are direct references to their failure to testify, or at least attempts to accomplish that purpose by indirection.

"It is the settled law of this state that it is reversible error for the prosecution to call to the attention of the jury the failure of defendant to testify." *State v. Brown*, 81 S.D. 195, 132 N.W.2d 840, 842 (1965). The prosecution may not make direct comments on the defendant's failure to take the stand, nor may it make indirect allusions designed to accomplish that end and which in fact could accomplish it. *State v. Best*, S.D., 232 N.W.2d 459 (1975). "But, if the evidence before the jury disclosed the existence of witnesses or evidence which the accused might have produced in his defense, the statute does not forbid comment upon the fact that the accused has failed to produce such witnesses or evidence. It may be difficult sometimes to draw the line between this kind of comment and that which in fact

does and is intended to direct the attention of the jury to the failure of the accused to testify. \* \* \* Where no direct allusion is made to the fact, but the error rests in an alleged intent to accomplish such purpose by indirection, each case must be considered upon its own particular facts."[13] *State v. Knapp*, 33 S.D. 177, 144 N.W. 921, 922 (1914).

After careful examination of the prosecution's closing argument, we find that the comments complained of, when viewed in context, are not reversible error. A reasonable intelligent jury would not have understood these comments to point out the defendants' failure to testify. Rather the comments are directed at calling attention to the defendants' failure to call witnesses and pointing out the state of the evidence. Both types of comments are permissible. *State v. Best, supra; State v. Brown, supra; State v. Knapp, supra*; see also *Beal v. State*, Tex.Cr.App., 520 S.W.2d 907 (1975); *People v. Vargas*, 9 Cal.3d 470, 108 Cal. Rptr. 15, 509 P.2d 959 (1973); *State v. Sechrest*, Mo., 485 S.W.2d 96 (1972); *People v. Bethea*, 18 Cal.App.3d 930, 96 Cal.Rptr. 229 (1971). See generally, Annot., 14 A.L.R.3d 723 (1967).

Defendants urge that *State v. Lindic*, 51 S.D. 516, 215 N.W. 495 (1927) compels a different result. Admittedly the offensive language in *Lindic* is much the same as some of the prosecutor's language in this case. However, the continued viability of *Lindic* was surely subject to question after *State v. Brown, supra*. We lay any remaining question to rest here. To the extent that *Lindic* prohibited comments on the defendant's failure to introduce evidence, it is overruled.

We find no reason to disturb the convictions in this case. The judgments of conviction are affirmed; the order dismissing the three counts of assault with a dangerous weapon, without intent to kill, for lack of jurisdiction is reversed and the matter remanded for further action on those charges.

**13.** The statute referred to was the Compiled Laws of 1913, Code of Criminal Procedure § 361. It was held in *State v. Vroman*, 45 S.D. 465, 188 N.W. 746 (1922), that such comments violated a defendant's constitutional rights under S.D.Const., art. VI, § 9.

All the Justices concur.

WINANS, Retired Justice, sitting for ZASTROW, J., disqualified.